Vincent P. Slusher
State Bar No. 00785480
vincent.slusher@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Thomas R. Califano
New York State Bar No. 2286144
thomas.califano@dlapiper.com
Jeremy R. Johnson
New York State Bar No. 4307617
jeremy.johnson@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
Tel:  (212) 335-4500
Fax:  (212) 335 4501

Proposed Attorneys for Lincolnshire Campus, LLC and Naperville Campus, LLC,
Debtors and Debtors in Possession

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 10-34176** |
| | § | |
| | § | **CHAPTER 11** |
| **LINCOLNSHIRE CAMPUS, LLC, *et al.*[1]** | § | |
| | § | **Joint Administration Pending** |
| Debtors. | § | |

**EMERGENCY MOTION FOR BANKRUPTCY RULE 2004
EXAMINATION OF THE BOND TRUSTEE**

Lincolnshire Campus, LLC and Naperville Campus, LLC, two of the above-referenced debtors and debtors in possession (together, the "Debtors"), by their proposed attorneys, hereby

---

[1] The Debtors in these chapter 11 cases are (a) Lincolnshire Campus, LLC, Case No. 10-34176, (b) Naperville Campus, LLC, Case No. 10-34177, (c) Monarch Landing, Inc., Case No. 10-34179, and (d) Sedgebrook, Inc., Case No. 10-34178.  A motion seeking joint administration of the Debtors' cases was on June 15, 2010.

move (the "Motion") this Court for an order pursuant to rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to examine Wells Fargo Bank National Association ("Wells Fargo" or the "Bond Trustee"). In support of the Motion, the Debtors respectfully represent as follows:

## Preliminary Statement

1. The Bond Trustee precipitated these cases by violating an agreement to negotiate in good faith and implied 90-day forbearance by "sweeping" certain of the Debtors' bank accounts in an effort to collect payments allegedly owed to the Bond Trustee by the Debtors. The Debtors seek production of documents by the Bond Trustee in connection with transactions with the Debtors. It is critical that this examination occur now because the conduct of the Bond Trustee caused the Debtors to file these chapter 11 cases, based on actions taken by the Bond Trustee to the detriment of the Debtors and their creditors.

## Jurisdiction and Venue

2. This Court has jurisdiction over this Motion under 28 USC §§157 and 1334. This matter is a core proceeding within the meaning of 28 USC §157.

3. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicate for the relief requested herein is Bankruptcy Rule 2004.

## Background

5. On June 15, 2010 (the "Petition Date"), the Debtors commenced these cases by each filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

6. The Debtors remain in possession of their assets and continue to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

7. The Office of the United States Trustee has not appointed a committee of unsecured creditors in these cases. No trustee or examiner has been appointed.

## Relief Requested

8. By this Motion, Debtors seek to examine the financial affairs of the Bond Trustee as they relate to these cases and the administration of the Debtors' estates. The Bond Trustee precipitated these cases by violating an agreement to negotiate in good faith and implied 90-day forbearance by "sweeping" certain of the Debtors' bank accounts in an effort to collect payments allegedly owed to the Bond Trustee by the Debtors. Debtors now seek, as permitted by Bankruptcy Rule 2004, to examine the financial affairs of the Bond Trustee as they relate to these cases and the Debtors.

## Overview of the Debtors' Businesses

**A. ERC Chapter 11 Proceedings**

9. Approximately nine (9) months prior to the Petition Date, the parent corporation of Naperville and Lincolnshire, Erickson Retirement Communities, LLC ("ERC"), and certain other of its related entities[2] filed voluntary petitions for chapter 11 protection in this Court (Main Case No. 09-37010) (the "ERC Cases"). ERC developed and managed the Facilities (as defined below) for the Debtors. ERC's Fourth Amended Joint Plan of Reorganization Under Chapter 11

---

[2] The Debtors in ERC's chapter 11 cases are: (a) Erickson Retirement Communities, LLC; (b) Ashburn Campus, LLC; (c) Columbus Campus, LLC; (d) Concord Campus GP, LLC; (e) Concord Campus, LP; (f) Dallas Campus GP, LLC; (g) Dallas Campus, LP; (h) Erickson Construction, LLC; (i) Erickson Group, LLC; (j) Houston Campus, LP; (k) Kansas Campus, LLC; (l) Littleton Campus, LLC: (m) Novi Campus, LLC; (n) Senior Campus Services, LLC; (o) Warminster Campus GP, LLC; and (p) Warminster Campus, LP.

of the Bankruptcy Code (the "ERC Plan") was confirmed on April 16, 2010 and went effective on April 30, 2010. The ERC Cases are still pending before this Court.

B. **Continuing Care Retirement Communities**

10. Continuing care retirement communities ("CCRCs") are large campus-style communities that offer seniors a full life-cycle of retirement services from independent living through skilled nursing on the same property. ERC generally develops a CCRC in three (3) phases. First, ERC selects a site for the construction of the new CCRC and creates a wholly-owned subsidiary to purchase the land (a "Landowner"). Second, ERC begins the construction and development of the new CCRC. Once ERC begins to market a community, ERC associates with an independent not-for-profit operator (a "NFP") to operate the new campus, and the NFP enters into a management agreement with ERC to manage the campus. Third, when the construction of the CCRC is complete, the land and campus are sold to the NFP, and ERC continues to manage the campus.

11. Naperville Campus, LLC ("Naperville"), a Landowner, owns the land upon which the CCRC in Naperville, Illinois (the "Naperville Facility") was constructed, which opened in July 2006. Monarch Landing, Inc. ("Monarch"), an NFP, operates the Naperville Facility and leases the land from Naperville pursuant to a master lease. Monarch was established on August 10, 2004, as a Maryland nonstock corporation to operate the Naperville Facility. As of the Petition Date, the Naperville Facility had 362 completed independent living units and a seventy one percent (71%) occupancy rate. It was originally anticipated that the Naperville Facility would include up to 1,498 independent living units, 96 assisted living units and 132 skilled nursing beds.

12. Monarch is classified as a Internal Revenue Code Section 501(c)(3) organization based on its mission to provide affordable senior housing to seniors. Monarch is a supported organization of National Senior Campuses, Inc. ("NSC"), a not-for-profit organization organized to support Monarch and 16 other not-for-profit organizations that operate CCRCs. NSC is the sole member of Monarch and appoints all of the members of its board of directors.

C.  **The Bonds**

13. Monarch has existing asserted prepetition debt in the form of the IFA Revenue Bonds in the original issued amount of $178,745,000. Of this amount, it is asserted that $177,890,000 in principal remains outstanding. The IFA Revenue Bonds are comprised of two series, Series A and Series B. Series B Bondholders are secured by the Fifth Third Bank Letter of Credit.

D.  **Events Leading to Chapter 11 Filing**

14. Under the terms of the ERC Plan, the Bond Trustee was to negotiate in good faith with ERC and its affiliated debtors and Redwood-ERC Senior Living Holdings, LLC, a Maryland limited liability company ("Redwood"), regarding the possible sale of the Facilities, as well as another related facility, Linden Ponds, Inc., to Redwood during the 90-day period following the confirmation of the Plan (i.e. from April 30, 2010 through July 31, 2010) (the "Negotiation Period").[3] Although the Bond Trustee had an obligation to negotiate in good faith during the Negotiation Period, on or about May 27, 2010, the Bond Trustee inappropriately

---

[3] Section 6.2.3.1 of the Plan provides:

*Disposition.* During the 90-day period immediately following the Plan Confirmation Date, Redwood will negotiate (non-exclusively) in good faith with the applicable NFPs and Bond Trustee for the Bond Communities to reach a resolution regarding such Bond Communities. During such 90-day period, the applicable NFP, with the consent of the applicable Bond Trustee, may market the applicable Bond Community for sale with the consent of the applicable Bond Trustee and letter of credit provider, may consummate such sale. At the conclusion of the 90-day period, if the parties have reached a resolution with respect to a particular Bond Community then the Debtors will facilitate a definitive agreement regarding such a resolution for such Bond Community. If Redwood does not reach an agreement with respect to resolution of a particular Bond Community during this 90-day period that is acceptable to Redwood, the applicable NFP, the letter of credit provider and the applicable Bond Trustee, then promptly at the end of such 90-day period, ERC's interests in the entity related to such Bond Community (Naperville Campus, LLC, Linconshire Campus, LLC and/or Hingham Campus, LLC, as applicable will be transferred to the applicable NFP.

effectuated a set-off against the Monarch's cash reserves in the amount of $15,166,737.69. Additionally, the Bond Trustee removed certain amounts held in escrow for the benefit of the Debtors in order to pay its professional fees without following the requisite procedures proscribed in the bond documents, primarily the submission of bills and request of payment from Monarch. The actions of the Bond Trustee have threatened to destabilize Monarch's operations by severely limiting liquidity and endangering its residents. The Debtors filed these chapter 11 proceedings to protect their assets and to stop the Bond Trustee from causing further damage to their operations and threatening the well being of their residents.

**Arguments and Authorities**

15. Rule 2004(a) of the Bankruptcy Rules provides that, "[o]n motion of any party in interest, the court may order the examination of any entity." FED. R. BANKR. P. 2004(a). By its express language, a Rule 2004 examination contemplates a broad and far-reaching inquiry into the debtor's affairs, including "any matter that may affect the administration of the debtor's estate, or to the debtor's right to a discharge." FED. R. BANKR. P. 2004(b). Rule 2004(a) of the Bankruptcy Rules provides that, "[o]n motion of any party in interest, the court may order the examination of any entity." FED. R. BANKR. P. 2004(a). As explained above, on June [ ], 2010, the bond trustee for Monarch precipitated these cases by, in violation of an agreed stay of such action, a set-off or "sweeping" certain bank accounts held by the Debtors, choking the Debtors of cash vital for their day-to-day operations.

16. As a general proposition, Rule 2004 examinations are appropriate for revealing the nature and extent of the bankruptcy estate, and for discovering assets, examining transactions and determining whether wrongdoing has occurred. *In re Enron Corp.*, 281 B.R. 836, 840 (S.D.N.Y. 2002) (citations omitted). Numerous courts have held that the scope of a Rule 2004 examination is broader than the discovery permitted under the Federal Rules of Civil Procedure.

*See, e.g., In re Fred Ayers Co., Inc.*, 266 B.R. 557 (Bankr. M.D. Ga. 2001). Furthermore, a motion for a Rule 2004 examination may be heard on an *ex parte* basis. *See* Advisory Committee Note to Rule 2004; *In re Hickman*, 151 B.R. 125 (Bankr. N.D. Ohio 1993).

17. Debtors believe that significant claims may exist against the Bond Trustee and an examination is warranted in order to preserve the property of the estates for the benefit of all creditors.

18. Moreover, an immediate examination of the Bond Trustee is necessary in order to enable Debtors to determine the extent of their respective estates, specifically with regards to operating capital, which they require to operate on a day-to-day basis -- capital that the Debtors believe may be in the possession of, or in danger of being impermissibly taken by, the Bond Trustee.

19. Accordingly, Debtors move for an Order of this Court directing the Bond Trustee to designate one or more officers, directors, or other representatives with personal knowledge of the Bond Trustee's financial condition and business activities for examination by the Debtors within ten (10) days from the entry of such Order and requiring the Bond Trustee to produce the documents described in Schedule A to the Motion within ten (10) days from the entry of such Order.

**Notice**

20. Notice of this Motion has been provided to (a) the Office of the United States Trustee for the Northern District of Texas; (b) the Debtor's twenty largest unsecured creditors; and (c) the Bond Trustee. The Debtor submits that, in light of the nature of the relief requested, no other or further notice is necessary or required.

WHEREFORE, PREMISES CONSIDERED, the Debtors request that this Court (i) grant the relief requested in the Motion, (ii) permit the Debtors to perform an examination of the Bond Trustee pursuant to Rule 2004; (iii) require the Bond Trustee to comply the requests detailed in <u>Schedule A</u>, and (iv) grant the Debtors such other and further relief, both at law and in equity, which is just and proper.

Date: June 16, 2010
      Dallas, Texas

Respectfully submitted,

By: */s/ Vincent P. Slusher*
Vincent P. Slusher
State Bar No. 00785480
vince.slusher@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Thomas R. Califano (*Pro Hac Vice*)
thomas.califano@dlapiper.com
Jeremy R. Johnson (*Pro Hac Vice*)
jeremy.johnson@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 835-6000
Fax: (212) 835-6001

Proposed Attorneys for Lincolnshire Campus, LLC and Naperville Campus, LLC, Debtors and Debtors in Possession

### **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 16th day of June, 2010, copies of the foregoing Motion For Bankruptcy Rule 2004 Examination Of The Bond Trustee were sent by first-class mail postage prepaid to (i) the Office of the United States Trustee; (ii) the Debtors' twenty largest unsecured creditors, and (iii) the Bond Trustee as defined in the Motion.

/s/Vincent P. Slusher
Vincent P. Slusher

**SCHEDULE A**

**DOCUMENT REQUESTS PURSUANT TO BANKRUPTCY RULE 2004**

Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, Linconshire Campus, LLC, Naperville Campus, LLC, Monarch Landing, Inc., and Sedgbrook, Inc. (collectively referred to herein as the "Debtors"), hereby request that Wells Fargo Bank National Association ("Wells Fargo" or the "Bond Trustee") designate one or more officers, directors, or other representatives with personal knowledge of the Bond Trustee's financial condition and business activities for examination by the Debtors and produce all documents responsive to the following Requests for Production of Documents (collectively, the "Discovery Requests"). Each of the Discovery Requests is to be answered fully and separately, in writing and under oath, and provided to the offices of DLA Piper LLP (US), Attn: Thomas R. Califano. These Discovery Requests are continuing and each and all answers and responses must be supplemented in accordance with the Federal Rules of Bankruptcy Procedure.

**DEFINITIONS AND INSTRUCTIONS**

**I.  Definitions.**

The following definitions apply to each of the Discovery Requests set forth herein and are deemed to be incorporated in each of said Discovery Requests.

      A.    "Debtors" shall mean the debtors in the above-captioned bankruptcy proceeding.

      B.    "Wells Fargo" shall mean Wells Fargo Bank National Association.

      C.    "Bond Trustee" shall mean Wells Fargo Bank National Association.

      D.    "Monarch" shall mean the real property and improvements known as the "Monarch Landing Campus," located in and around 2255 Erickson Drive, in Naperville, Illinois.

      E.    "Bonds" shall mean the municipal bond offerings secured by Monarch or Sedgebrook in favor of the Bond Trustee.

F. "ERC Plan" shall mean the Fourth Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code approved in <u>In re Erickson Retirement Communities</u>, Case No. 09-37010 (SGJ) (N.D. Tex. 2010).

G. "You" and "Your" means the Bond Trustee, individually and collectively, and their respective attorneys, agents, employees, consultants, accountants, private investigators and any other representative as the context may require.

H. "Court" shall mean the United States Bankruptcy Court for the Northern District of Texas.

I. "Document" or "Documents" is synonymous in meaning and scope to the usage of the term in Federal Rules of Civil Procedure 34(a), and includes, but is not limited to, writings, drawings, graphs, charts, photographs, video or audio recordings, facsimile transmissions, or other data compilations, from which any intelligence can be perceived or information can be obtained, with or without the use of detection devices (including all non-identical drafts, copies or reproductions thereof), including information stored electronically in computer or any media, which are in your possession, custody or control.

J. "All Documents" shall mean every document within the custody, possession or control of the person or entity to whom a Discovery Request is directed, and/or its attorneys, representatives, employees, and/or agents, whether an original or copy, as defined above, known to you and every such document or writing which you can locate or discover by reasonably diligent efforts.

K. "Concerning" shall mean relating to, referring to, regarding, describing, evidencing or constituting.

L. The singular includes the plural and the plural includes the singular. The masculine includes the feminine and the neutral genders.

M. "And" shall mean and/or.

N. "Or" shall mean and/or.

O. "Including" means "including, but not limited to."

P. The phrases following "including" are intended to illustrate the kinds of matters that we believe are responsive to the Discovery Request. Such examples are not intended to be exhaustive of the materials sought and shall not in any way be read to limit the scope of the Discovery Request.

Q. The term "relate" or "relate to" or "relating to" as used herein mean refer to, summarize, reflect, constitute, contain, embody, mention, show,

comprise, evidence, discuss, establish, describe, comment upon, reflect, identify, state, or in any way relevant to the subject matter stated.

## II. Instructions.

1. These Discovery Requests shall be deemed to be continuing in nature and require any responses to these requests, including any documents or tangible things provided pursuant to these Discovery Requests, which are later found to be incorrect or incomplete, or to have been incorrect or incomplete because of changed circumstances, to be corrected and completed by means of supplementary responses. Unless otherwise specified, each Discovery Request calls for documents, or tangible things, through the date on which the response is served.

2. If a claim of privilege is asserted to any document or tangible thing requested to be produced herein, such documents shall be sufficiently described in connection with such claim. A document or tangible thing is sufficiently described for this purpose if the following information is provided:

    (a) The nature of the privileged claim;

    (b) In the case of a document, the approximate date on which the document was prepared, its title, the type of document (e.g., letter, memo, etc.) and its author;

    (c) In the case of a tangible thing, the date the thing came into Your possession and the generic or trade name of the thing;

    (d) The name and position of each person, other than attorneys representing You in connection with this lawsuit, to whom the contents of the document or the characteristics of the tangible thing have been communicated by copy, exhibition, reading or substantial summarization; and

    (e) A brief description or summary of the contents and/or characteristics of the document or tangible thing sufficient to explain the subject matter and the privilege involved.

3. The documents and tangible things produced pursuant to the Discovery Requests shall be segregated according to the paragraphs and subparagraphs pursuant to which they are produced.

4. If any document or tangible thing requested was, but no longer is, in Your possession or subject to Your custody or control or was, but no longer is, in existence, state the following:

(a) Whether it is missing or lost;

(b) Whether it has been destroyed;

(c) Whether it has been transferred, voluntarily or involuntarily to others; and

(d) Whether it has been disposed of otherwise.

5. With respect to each such document, explain the circumstances surrounding such disposition, identify each person directly or immediately authorizing same and the date(s) thereof. Identify each document by listing its author and the author's address, the type of document (e.g., letter, memo, etc.); its date and subject matter, its present location and custodian, and whether the document or any copy thereof is still in existence.

6. These Requests are directed at You with respect to documents in Your possession or custody or subject to Your control. You have an obligation and duty to respond fully and separately as to each of the following Requests.

7. With respect to any document that is requested pursuant to a Request for Production of Documents, each document that is attached by staple, clip, or otherwise to a document, the production of which is requested herein, shall also be produced (attached in the same manner as the original) regardless of whether production of that document is otherwise requested herein.

8. If more than one copy of any requested document is in Your possession, custody or control, produce each copy that in any way differs from any other copy, including, without limitation, differences caused by writings placed thereon by any person, numbers of pages comprising the document, or documents attached thereto by staple, clip or otherwise.

9. Unless another timeframe is provided in a specific Request, information and/or documents from January 1, 2010 to June 15, 2010 should be produced.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:**

All documents concerning the value of any of the Debtors' assets.

**REQUEST FOR PRODUCTION NO. 2:**

All documents concerning any efforts to market the property or assets of any of the Debtors.

**REQUEST FOR PRODUCTION NO. 3:**

All documents concerning any demand for payment by the Bond Trustee relating to the Bonds.

**REQUEST FOR PRODUCTION NO. 4:**

All documents that refer or relate to the Bond Trustee's acquiescence or agreement to the terms of the ERC Plan.

**REQUEST FOR PRODUCTION NO. 5:**

All documents that refer or relate to the Bond Trustee's efforts to collect payments relating to the Bonds.

**REQUEST FOR PRODUCTION NO. 6:**

All documents concerning any of the Debtors' reserve funds which the Bond Trustee may have set off.

**REQUEST FOR PRODUCTION NO. 7:**

All documents that refer or relate to communications between the Bond Trustee and any holders of Bonds relating to the Bonds.

**REQUEST FOR PRODUCTION NO. 8:**

All documents that refer or relate to communications between the Bond Trustee and the Debtors relating to the Bonds.

**REQUEST FOR PRODUCTION NO. 9:**

All documents concerning the payment of the Bond Trustee's professional fees from escrow accounts of the Debtors.