Vincent P. Slusher
State Bar No. 00785480
vincent.slusher@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Thomas R. Califano
New York State Bar No. 2286144
thomas.califano@dlapiper.com
Jeremy R. Johnson
New York State Bar No. 4307617
jeremy.johnson@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501

Proposed Attorneys for Lincolnshire Campus, LLC and Naperville Campus, LLC,
Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 10-34176** |
| | § | |
| | § | **CHAPTER 11** |
| **LINCOLNSHIRE CAMPUS, LLC, *et al.*** [1] | § | |
| | § | **Joint Administration Pending** |
| **Debtors.** | § | |

## AFFIDAVIT OF PAUL RUNDELL IN SUPPORT OF FIRST DAY MOTIONS OF
## LINCOLNSHIRE CAMPUS, LLC AND NAPERVILLE CAMPUS, LLC

State of New York    )
                     ) ss.:
County of New York   )

　　　1.　　I am the Chief Restructuring Officer of Senior Living Retirement Communities

---

[1] The Debtors in these chapter 11 cases are (a) Lincolnshire Campus, LLC, Case No. 10-34176, (b) Naperville Campus, LLC, Case No. 10-34177, (c) Monarch Landing, Inc., Case No. 10-34179, and (d) Sedgebrook, Inc., Case No. 10-34178. A motion seeking joint administration of the Debtors' cases was filed on June 15, 2010.

LLC, formerly known as Erickson Retirement Communities, LLC ("Senior Living"), which is the sole member of Lincolnshire Campus, LLC ("Lincolnshire") and Naperville Campus, LLC ("Naperville") the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors").

2.  I am also a Managing Director of Alvarez & Marsal[2] in its Healthcare Industry Group in New York, New York.  I have more than thirteen (13) years of experience, specializing in interim management, with a focus on cash management and financial analysis.  I have provided cash management, financial support, crisis management, turnaround consulting, business strategy and planning, market analysis and operational improvement services to clients, and I have advised unsecured and secured creditors and debtors both in and out of court.

3.  In my capacity as Chief Restructuring Officer for the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this Affidavit on behalf of the Debtors.

4.  On June 15, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

5.  The Debtors remain in possession of their assets and continue to manage their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.  No trustee, examiner, or committee has been appointed in these cases.

---

[2] Alvarez & Marsal was retained by the Debtors in June 2010.  The Debtors intend to file an application with this Court to employ and retain Alvarez & Marsal as their financial advisors in these chapter 11 cases.

EAST\43038197.8

7. The Debtors have filed or anticipate filing the following motions and applications (collectively, the "First Day Motions"):

    (a)    Motion For Order Directing Joint Administration Of The Debtors' Chapter 11 Cases;

    (b)    Emergency Motion for Bankruptcy Rule 2004 Examination of the Bond Trustee; and

    (c)    Motion For Order Authorizing (I) Continued Use Of Existing Cash Management System, (II) Maintenance Of Existing Bank Accounts, (III) Continued Use Of Existing Business Forms, And (IV) Maintenance Of Existing Investment Practices.

8. I am submitting this Affidavit in support of the Debtors' First Day Motions. Capitalized terms not defined in this Affidavit shall have the meanings ascribed to the term in the relevant First Day Motion. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by management, advisors, or other representatives of the Debtors. If I were called upon to testify, I would testify consistently with the facts set forth in this Affidavit.

9. During the past year senior living facilities, including the Debtors' facilities, have suffered substantial declines in sales and occupancy and have faced various obstacles in their construction and development as a result of the struggling economy, the weakened credit environment, limited access to capital, declining real estate values, among other things. Prospective senior residents are having difficulty selling their homes and have lost significant amounts of their retirement funds in the market, making it difficult, if not impossible, for them to move into or remain in senior housing facilities.

10. As a result of these challenging market conditions, the Debtors and their direct parent company, Erickson Retirement Communities, LLC ("ERC") have suffered a substantial

EAST\43038197.8

loss of revenue and lower than anticipated absorption rates. This in turn forced ERC and certain other of its related entities[3] to seek chapter 11 protection approximately nine (9) months prior to the Petition Date by filing for bankruptcy in this Court (Main Case No. 09-37010) (the "ERC Cases"). ERC's Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "ERC Plan") was confirmed on April 16, 2010. The ERC Cases are still pending before this Court.

11.     This Affidavit provides an overview of the Debtors and the circumstances leading to the commencement of these chapter 11 cases. Section I provides an overview of the Debtors' operations. Section II recounts the events preceding the bankruptcy filing. Section III affirms and incorporates facts that support the First Day Motions.

## I.     Overview of the Debtors' Business

### A.     Description of the CCRCs

12.     The continuing care retirement communities (the "CCRCs") offer seniors a full lifecycle of services during their retirement years from independent living to skilled nursing care on the same campus. These facilities provide affordable living accommodations and related healthcare and support services to a target market of middle-income seniors aged sixty-two (62) years and older.

13.     Unlike limited purpose senior living facilities that specialize in providing care for a particular set of healthcare needs, the Debtors' CCRCs do not require seniors to relocate as

---

[3] The Debtors in ERC's chapter 11 cases are: (a) Erickson Retirement Communities, LLC; (b) Ashburn Campus, LLC; (c) Columbus Campus, LLC; (d) Concord Campus GP, LLC; (e) Concord Campus, LP; (f) Dallas Campus GP, LLC; (g) Dallas Campus, LP; (h) Erickson Construction, LLC; (i) Erickson Group, LLC; (j) Houston Campus, LP; (k) Kansas Campus, LLC; (l) Littleton Campus, LLC: (m) Novi Campus, LLC; (n) Senior Campus Services, LLC; (o) Warminster Campus GP, LLC; and (p) Warminster Campus, LP.

their needs change. Rather, the CCRCs enable seniors to remain in the same place as they age and their needs change by providing various levels of support and care at the same facility. In addition, the CCRCs provide the residents with multiple entertainment outlets and other social benefits for all stages of their retirement living.

14.     The Debtors' CCRCs are akin to small college campuses with multiple interconnected buildings which typically include several on-site dining rooms, an on-site medical center, on and off-campus transportation, on-site classes, fully-staffed fitness centers, card rooms, game rooms, an indoor aquatics center for exercise and recreation, an auditorium, an in-house television studio run by the residents, a library, full-service branch banks, beauty salons, convenience stores, and other amenities. When completed, the Debtors' CCRCs are five (5) times larger than alternative facilities, thereby providing residents with more amenities, offerings, and feeling of community.

15.     The CCRCs are generally developed in three (3) phases. First, ERC selects a site for the construction of the new CCRC and creates a wholly-owned subsidiary to purchase the land (the "Landowner"). Second, the construction and development of the new CCRC begins. When the CCRC is ready for occupancy by residents, an independent not-for-profit operator (the "NFP") begins to operate the new campus, and the NFP enters into a management agreement with ERC to manage the campus. Third, when the construction of the CCRC is complete, the land and campus are sold to the NFP.

    i.      The Not-For-Profits

16.     One of the unique aspects of the CCRCs is the fact that ERC associates with National Senior Campuses, Inc. ("NSC"), a not-for-profit organization, to operate the campuses. Each NFP is classified as a 501(c)(3) organization based on its mission to provide affordable senior housing to seniors. The NFP contracts with ERC to provide for the management of the

- 5 -

communities. The goal upon the completion of the construction and development of a CCRC is to sell the CCRC to the NFP.

17.     The NFP receives revenue from several sources—residents' initial entrance deposits ("IEDs"), residents' monthly fees, and municipal bond offerings as a result of their 501(c)(3) status. The municipal bond offerings are explained in more detail below.

18.     Prior to a resident's occupancy of an independent living unit in the community (a "Unit"), the NFP enters into a residence and care agreement (the "Residence and Care Agreement") with the resident. Under the terms of the Residence and Care Agreement, each resident agrees to pay the NFP an IED and monthly service fees, which average about $1,800 per Unit. In return, the resident is permitted to occupy a Unit in the community for a lifetime, subject to certain conditions. Pursuant to the Residence and Care Agreements, the residents receive a full refund of their IEDs upon their death, permanent transfer to a higher acuity unit, or departure from the community, subject to a successful resale of the Unit. The residents can terminate the Residence and Care Agreement without cause on a thirty-day notice, and the Residence and Care Agreements can be assigned to a new manager/operator of the community if the manager/operator is certified as a continuing care provider.

        ii.     The IEDs

19.     The IEDs paid by the residents prior to their occupancy of a Unit range from $100,000 to $600,000. When a resident moves out or dies, if the Unit's new entrance deposit is the same or greater than the IED price paid by the departing resident, then the departing resident's IED will be 100% refunded and the NFP will keep the difference between the new entrance deposit and the departing resident's IED from the sale of the Unit. If the new entrance deposit is less than the departing resident's IED, then the departing resident will generally receive the lesser amount. In this scenario, the NFP does not participate in the downside risk in

- 6 -

this transaction.

20.     As an example, if an IED on a Unit was $270,000 and a new entrance deposit of $300,000 is received, the NFP keeps the $30,000 difference for campus enhancements or improvements (and the $270,000 is returned to the departing resident once the Unit has been re-occupied, subject to payment of outstanding accounts). If an IED on a Unit was $270,000 and a new entrance deposit of $250,000 is received, then the $250,000 is returned to the departing resident. Generally the departing resident or his or her descendants must consent to sell the Unit at the lower price prior to the NFP making such a sale.

21.     In the ERC Cases, the IEDs were placed in escrow in order to protect the residents' interests in their IEDs during the pendency of the ERC Cases. This measure was necessary in order to assure current and future residents that their IEDs would not be disturbed. The bond trustees involved in these chapter 11 cases have not been willing to consent to an escrow or nondisturbance agreement. Currently, the bond trustees hold a total of $5,627,154.43 in the IEDs and the NFP's hold a total of $2,124,798.20 in the IEDs.

        iii.    The Lifecycle of a CCRC

22.     Each CCRC is typically developed in three (3) phases over a period of seven (7) to ten (10) years. Generally, the total projected cost to complete one CCRC is approximately $300 million to $500 million, including construction financing costs.

23.     A fully developed CCRC is generally comprised of three (3) or more residential neighborhoods. Each neighborhood has one community building (the average cost of a community building is $15 million), and four (4) to five (5) residential buildings with 80-120 independent living units (the average cost of one residential building is $21 million). Each campus also has a care center with approximately thirty-six (36) assisted living units and eighty-four (84) skilled nursing units (the average cost of one care center is $13 million). Residents

- 7 -

generally move into a residential building within one year after construction begins.

### a. First Phase: Land Acquisition, Construction, and Development

24.     During the first phase of a community, ERC would form a Landowner to purchase the land. The Landowner would have ownership of both the real property and all improvements as they are constructed on the land, until the community is sold to the NFP. In general, the land acquisition was financed through cash, equity provided by ERC, construction loans, and/or sub-debt.

25.     Once the land was acquired, the Landowner would begin the construction and development of the community. The construction was initially financed by the Landowner through a revolving construction loan (the "Construction Loan") from a third party. This loan was secured by a first priority lien on all assets of the Landowner, all liens rights of the Landowner in and to assets of the NFP (e.g. the Residence and Care Agreements and the residents' IEDs), all lien rights of the Landowner in and to assets of ERC, and all assets of ERC relating to the specific community. In certain communities, the Construction Loan was guaranteed by ERC, Erickson Group, and/or Erickson Construction.

26.     At that point, the Landowner and ERC would enter into a development agreement (the "Development Agreement"), pursuant to which ERC agreed to plan, administer, and supervise all design, development and construction services and activities of a campus, and the Landowner paid ERC a development fee, which generally equals 5% of all residents' IEDs collected at a campus.

### b. Second Phase: Occupancy by Residents

27.     At the beginning of the marketing of a new project, an NFP would be created to operate the campus on a day-to-day basis. The NFP and the Landowner would enter into a master lease agreement (the "Master Lease"), pursuant to which the NFP leased the land and the

- 8 -

improvements from the Landowner. The Master Lease was typically a twenty-year, triple net lease, requiring the NFPs to pay all ongoing maintenance expenses (e.g. utilities, taxes, and insurance), with a ten-year renewal option.

28.     During the period that the Construction Loan was outstanding, the Landowner also entered into a community loan agreement with the NFP (the "Community Loan"), pursuant to which the NFP leant the Landowner all IEDs collected from the community residents prior to their occupancy of a Unit. The proceeds of the Community Loan were generally sufficient to pay all construction and development costs of a community, pay off the Construction Loan, and provide a return of the Debtors' investment together with a development profit. Debt service on the Community Loan paid by the Landowner to the NFP was fully offset by the rental payments made by the NFP to the Landowner under the Master Lease. The Landowner's obligations were secured by a mortgage on the property in favor of the NFP. The Landowner's obligations under the Community Loan were subordinate to its obligations under the Construction Loan.

29.     To fund the working capital deficits of the NFP, the Landowner provided a working capital loan (the "Working Capital Loan") to the NFP. To secure its obligations under the Working Capital Loan, the NFP granted the Landowner a security interest in all assets of the NFP, including the Residence and Care Agreements and the IEDs.

30.     In addition, the NFP and ERC entered into a management and marketing agreement (the "Management Agreement"), pursuant to which ERC was hired by the NFP as the NFP's manager and was permitted to exercise oversight over the NFP's activities. The NFP payed ERC a management fee, which was typically comprised of a base fee generally ranging from 4.0% to 5.5% of resident monthly fees, or a negotiated fixed fee, and which is adjusted according to occupancy levels. The NFP also reimbursed ERC for direct and allocated costs.

- 9 -

Historically, the term of the Management Agreement was five (5) years, with a provision that allowed the NFP to terminate the agreement after three (3) years, provided that it submitted a thirty-day notice.

31.     When the CCRC was near completion, the NFP typically secured permanent financing through municipal bond offerings (tax-exempt bonds) (the "Project Bonds"). These Project Bonds were primarily issued two (2) to six (6) years following the commencement of construction. The obligors on the Project Bonds were the NFPs, not ERC. The Project Bonds had a fixed rate component that is typically long-term and a variable rate component that is paid down at stabilization. The variable rate bonds were typically backed by letters of credit provided by commercial banks.

32.     Upon the issuance of Project Bonds, the NFP entered into a purchase option agreement (the "Purchase Option Agreement") with the Landowner, whereby a significant portion of the proceeds of the Project Bonds were used by the NFP to pay the Landowner a purchase option deposit (the "Purchase Option Deposit") to ensure the sale of the community to the NFP. Pursuant to the Purchase Option Agreement, the bondholders received a first priority mortgage on the property. The Landowner used proceeds from the Project Bonds to pay off the Construction Loan.

### c.     Third Phase: Sale of the CCRC to the NFP

33.     During the final development phase of a community, the Landowner sells the CCRC to the NFP. The NFP generally purchases the campus for the lower of (i) 75% of the going-concern value based on a third-party appraisal, plus forgiveness of the Community Loan, or (ii) the Purchase Option Deposit, plus forgiveness of the Community Loan.

34.     Until the sale of the community to the NFP has closed, if the NFP defaults on the Project Bonds or decides not to purchase the community from the Landowner, the Landowner is

required to repay the Purchase Option Deposit to the NFP (plus all transaction costs for issuance of the Project Bonds and early redemption costs), which is then used to repay the tax-exempt bondholders. ERC guarantees the return of the Purchase Option Deposit to the NFP under these circumstances.

**B.    State Regulations**

35.    The CCRC industry is heavily regulated by state authorities. Each state has different regulations concerning, among other things, disclosure of financial statements, solvency of the facility, maintenance of a certain amount of reserves, and the refunding of IEDs.

36.    The NFPs operating the CCRCs are required to satisfy the regulations of the state where its facilities are located, in this case the state of Illinois. Remedies for violations of these state regulations include temporary suspension of the facility's license, permitting residents to obtain liens, increased oversight of the facility, restricting the facility's ability to accept new residents, and closing the facility.

**C.    Organizational Structure of the Debtors**

Lincolnshire Campus, LLC

37.    Lincolnshire, a Maryland limited liability company, with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

38.    As of May 31, 2010, on a book value basis, Lincolnshire has approximately $209.1 million in assets and $257.2 million in liabilities.

39.    Lincolnshire's main assets are: (i) the improved land located in Lincolnshire, Illinois upon which the Sedgebrook campus is constructed; (ii) cash and cash equivalents in the amount of approximately $274,000; and (iii) a lease agreement entered into between Lincolnshire and Sedgebrook, the not-for-profit organization that operates that operates the Sedgebrook campus.

- 11 -

40.     Lincolnshire's main liabilities are: (i) a community loan entered into between Lincolnshire and Sedgebrook in the amount of $73.5 million (the "Lincolnshire Community Loan"); (ii) Special Service Area No. 1 Special Tax Bonds, Series 2004, in the amount of $14.3 million, issued by the Village of Lincolnshire, Lake County, Illinois; and (iii) the refund of the $125 million Purchase Option Deposit in the event that the NFP does not purchase the community. The other debt associated with the Sedgebrook campus (i.e. the Illinois Finance Authority Revenue Bonds, Series 2007A, and Variable Rate Demand, Series 2007B) is owed by Sedgebrook (the NFP) and not Lincolnshire.

Naperville Campus, LLC

41.     Naperville, a Maryland limited liability company, with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

42.     As of May 31, 2010, on a book value basis, Naperville has approximately $176.3 million in assets and $196.3 million in liabilities.

43.     Naperville's main assets are: (i) the improved land located in Naperville, Illinois upon which the Monarch campus is constructed; (ii) cash and cash equivalents in the amount of approximately $333,000; and (iii) a lease agreement entered into between Naperville and Monarch, the not-for-profit organization that operates the Monarch campus.

44.     Naperville's main liabilities are: (i) a community loan entered into between Naperville and Monarch in the amount of $35.8 million (the "Naperville Community Loan"); (ii) Special Area No. 31 Special Tax Bonds, Series 2006, in the amount of $14.5 million, issued by the County of DuPage, Illinois; and (iii) the refund of the $130 million Purchase Option Deposit in the event that the NFP does not purchase the community. The other debt associated with the Monarch campus (i.e. the Illinois Finance Authority Revenue Bonds, Series 2007A, and Variable Rate Demand, Series 2007B) is the debt of Monarch and not Naperville.

- 12 -

### D.    The Campuses

Sedgebrook Campus

45.    The Sedgebrook campus, located in Lincolnshire, Illinois, opened in July 2005. Lincolnshire Campus, LLC, the Landowner, leases the land and campus to Sedgebrook, the NFP that operates this community, pursuant to a Master Lease.  The average monthly fee at this campus is $1,865.91, and the average IED is $273,291.  As of the Petition Date, the Facility had (i) 469 completed independent living units, 409 occupied units, and an eighty-seven percent (87%) occupancy rate; (ii) 44 completed assisted living units, 10 residents, and a percent (21.7%) occupancy rate; and (iii)  44 completed skilled nursing units, 22 residents, and a percent (49.7%) occupancy rate. It was originally anticipated that the Debtor's facilities would include up to 1,392 independent living units, 96 assisted living units and 132 skilled nursing beds.

46.    Management of the Sedgebrook campus was not transferred to Redwood-ERC Senior Living Holdings, LLC, a Maryland limited liability company ("Redwood"), pursuant to the ERC Plan.  Senior Living Retirement Communities, formerly known as ERC, has contracted with Redwood to manage the Sedgebrook campus.

Monarch Landing

47.    The Monarch Landing campus, located in Naperville, Illinois, opened in July 2006.  Naperville Campus, LLC, the Landowner, leases the land and campus to Monarch Landing, the NFP that operates this community, pursuant to a Master Lease.  The average monthly fee at this campus is $1,752.88, and the average IED is $277,856.  As of the Petition Date, the Facility had 360 completed independent living units, 257 occupied units and a seventy-one percent (71%) occupancy rate.  It was originally anticipated that the Facility would include up to 1,498 independent living units, 96 assisted living units and 132 skilled nursing beds.

48.     Management of the Lincolnshire campus was not transferred to Redwood pursuant to the ERC Plan.  Senior Living Retirement Communities, formerly known as ERC, has contracted with Redwood to manage the Lincolnshire campus.

### E.     The Debtors' Prepetition Capital Structure

Lincolnshire's Prepetition Capital Structure

49.     In the order of priority, Lincolnshire's prepetition capital structure[4] is as follows:

- Special Service Area No. 1 Special Tax Bonds, Series 2004, in the amount of $14.255 million, issued by the Village of Lincolnshire, Lake County, Illinois

- The Lincolnshire Community Loan:   To secure its obligations, Sedgebrook granted a security interest to Lincolnshire in the Residence and Care Agreements, IEDs, among other things.   Lincolnshire's obligations are secured by a mortgage on the property in favor of the NFP; and

- Equity funding from ERC.

Naperville's Prepetition Capital Structure

50.     In the order of priority, Naperville's prepetition capital structure[5] is as follows:

- Special Area No. 31 Special Tax Bonds, Series 2006, in the amount of $14.5 million, issued by the County of DuPage, Illinois, which were guaranteed by ERC;

- The Naperville Community Loan:   To secure its obligations, Monarch Landing granted a security interest to Naperville in the Residence and Care Agreements, IEDs, among other things.  Naperville's obligations are secured by a mortgage on the property in favor of the NFP; and

- Equity funding from ERC.

---

[4] The primary funding for this campus is Project Bonds issued to the NFP by Illinois Finance Authority in a total amount of $137,145,000.  The Project Bond debt is the obligation of the NFP and not Lincolnshire. Lincolnshire, however, must return the purchase deposit refund to the bond trustee upon the occurrence of certain events.

[5] The primary funding for this campus is Project Bonds issued to the NFP by Illinois Finance Authority in a total amount of $178,745,000.  The Project Bond debt is the obligation of the NFP and not Naperville.  Naperville, however, must return the purchase deposit refund to the bond trustee upon the occurrence of certain events.

## II. **Events Leading to Bankruptcy**

The Decline in the Market

51.     The senior housing market has been hindered over the past twelve (12) months by a weakened credit environment, including limited access to capital, falling real estate values, and significantly reduced liquidity due to realized and unrealized losses on investments. New senior housing units under construction have significantly declined since 2004. New units under construction in 2008 totaled 15,862, compared to 20,775 units in 2007, a twenty-four percent (24%) decline.

52.     Senior living facilities have experienced substantial declines in occupancy as a result of the market changes. Prospective residents are faced with (i) difficulty selling their homes due to uncertainty in value and (ii) significant declines in their equity portfolio value. This has made it difficult, if not impossible, for seniors to move into or remain in senior housing facilities, as the IEDs are generally significant ($100,000 to $600,000).

53.     The tightening of the credit market has also significantly affected the 2008 bond-issuance volume, making traditional fixed-rate debt essentially unavailable in the last quarter of 2008. The 2008 bond issuance for the senior living sector was $2.7 billion versus $8 billion in 2007, a decline of over sixty-six percent (66%).

54.     These market conditions have contributed to decreased revenue, lower than anticipated absorption rates at certain campuses, and difficulty raising capital. In addition, some of the developing campuses are not cash flow positive until they mature.

Bond Trustee's Adverse Actions

55.     As mentioned previously, the NFPs lease the Facilities from the Landowners (which ERC owns, directly or indirectly) pursuant to a master lease. Under the terms of the ERC Plan, the Bond Trustees were to negotiate in good faith with ERC and its affiliated debtors and

- 15 -

Redwood, regarding the possible sale of the Facilities, as well as another related facility, Linden Ponds, Inc., to Redwood during the 90-day period following the confirmation of the Plan (i.e. from April 30, 2010 through July 31, 2010) (the "Negotiation Period").[6] Although the Bond Trustees had an obligation to negotiate in good faith during the Negotiation Period, on or about May 27, 2010, the Bond Trustee for Monarch inappropriately effectuated a set-off against the Monarch's cash reserves in the amount of $15,166,737.69.

56.     Additionally, beginning in December of 2009, the Bond Trustees began removing amounts held in escrow for the benefit of the Debtors in order to pay their professional fees. In doing so, the Bond Trustees did not follow the requisite procedures for removing such funds as proscribed in the bond documents, primarily the submission of bills and request of payment from the NFP. Moreover, the Bond Trustees neglected to provide notice of their removal of the funds to either Sedgebrook or Monarch Landing. To date, the Bond Trustees have removed $835,136 from the Sedgebrook reserve account, and $792,562 from the Monarch Landing reserve account. The actions of the Bond Trustee has threatened to destabilize Monarch's operations by severely limiting liquidity and endangering its residents. The Debtors filed these chapter 11 proceedings to protect their assets and to stop the Bond Trustee from causing further damage to their operations and threatening the well being of their residents.

---

[6] Section 6.2.3.1 of the Plan provides:

*Disposition.* During the 90-day period immediately following the Plan Confirmation Date, Redwood will negotiate (non-exclusively) in good faith with the applicable NFPs and Bond Trustee for the Bond Communities to reach a resolution regarding such Bond Communities. During such 90-day period, the applicable NFP, with the consent of the applicable Bond Trustee, may market the applicable Bond Community for sale with the consent of the applicable Bond Trustee and letter of credit provider, may consummate such sale. At the conclusion of the 90-day period, if the parties have reached a resolution with respect to a particular Bond Community then the Debtors will facilitate a definitive agreement regarding such a resolution for such Bond Community. If Redwood does not reach an agreement with respect to resolution of a particular Bond Community during this 90-day period that is acceptable to Redwood, the applicable NFP, the letter of credit provider and the applicable Bond Trustee, then promptly at the end of such 90-day period, ERC's interests in the entity related to such Bond Community (Naperville Campus, LLC, Lincolnshire Campus, LLC and/or Hingham Campus, LLC, as applicable will be transferred to the applicable NFP.

EAST\43038197.8

NFP Bankruptcy Cases

57.    On the Petition Date, Monarch Landing Inc. and Sedgebrook Inc. filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code and are represented by separate counsel.

Exit Through 363 Sale

58.    The Debtors intend to sell substantially all of their assets through a sale process pursuant to section 363 of the Bankruptcy Code. To that end, the Debtors have begun the marketing process and intend to announce a stalking horse bidder in the coming weeks.

## III.    Facts in Support of First Day Motions

59.    Subsequent to the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions. The Debtors request that each of the First Day Motions described below be granted, as they constitute a critical element in ensuring the Debtors' successful reorganization in these chapter 11 cases.

### A.    Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")

60.    By the Joint Administration Motion, the Debtors seek an order consolidating, for procedural purposes only, the administration of the Debtors' chapter 11 cases with Debtor Lincolnshire as the lead debtor, pursuant to Bankruptcy Rule 1015. In addition, the Debtors request that the Clerk make an entry on the docket of each of the Debtors' cases, other than the Lincolnshire case, stating that an order has been entered directing joint administration of the chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in the Lincolnshire docket.

61.    The Debtors are all related entities and are filing petitions in the same court. I believe that joint administration will be less costly and burdensome than the separate

- 17 -

administration of the estates due to the combined docket and combined notice to creditors and parties in interest. Many applications, motions, orders, hearings and notices will be made in these cases and will affect all of the Debtors. Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.

62.     In addition, as the Debtors are only seeking administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be harmed.

63.     I believe that if each Debtor's case were administered independently, there would be a number of duplicative pleadings and overlapping service. This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Court's resources.

64.     Therefore, I believe that the Debtors' chapter 11 cases should be jointly administered for procedural purposes only.

**B.      Emergency Motion for Bankruptcy Rule 2004 Examination of the Bond Trustee (the "2004 Motion")**

65.     By the 2004 Motion, Debtors seek to examine the financial affairs of the Bond Trustee as they relate to these cases and the administration of the Debtors' estates. The Bond Trustee precipitated these cases by violating an agreement to negotiate in good faith and implied 90-day forbearance by "sweeping" certain of the Debtors' bank accounts in an effort to collect payments allegedly owed to the Bond Trustee by the Debtors. By the 2004 Motion, Debtors seek, as permitted by Bankruptcy Rule 2004, to examine the financial affairs of the Bond Trustee as they relate to these cases and the Debtors.

**C.      Motion for Order Authorizing (I) Continued Use of Existing Cash Management Systems, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms, and (IV) Maintenance of Existing Investment Practices (the "Cash Management Motion")**

66.     By the Cash Management Motion, Lincolnshire and Naperville Campus (the

"Movants") seek entry of an order granting the following relief:

(a)     the continued use of the existing Bank Accounts with the same names and account numbers as such Bank Accounts existed immediately prior to the Petition Date (with the option to both the Movants and the Banks of streamlining their Cash Management Systems by closing or consolidating Bank Accounts in accordance with the terms and conditions of the existing account and service agreements);

(b)     the ability of the Movants to deposit funds into and withdraw funds from any of the Bank Accounts (subject to available funds or, in the case of zero balance accounts, subject to the availability of funds in the applicable linked funding accounts) by all usual means, including but not limited to checks, wire transfers, electronic funds transfers and other debits;

(c)     the ability of the Movants to continue to make intercompany transfers among the Bank Accounts in the ordinary course of their business through the Cash Management System;

(d)     the ability of the Movants to otherwise treat the Bank Accounts, along with any accounts opened postpetition, for all purposes as debtor in possession accounts;

(e)     the waiver of any requirements to establish separate accounts for cash collateral and/or tax payments; provided, however, that accounts pledged or serving as collateral for prepetition obligations shall be maintained as such; and

(f)     authorizing and directing the Banks to maintain, service and administer such deposit accounts or investment accounts, without interruption and in the ordinary course of business, in accordance with applicable non-bankruptcy law and the account agreements and/or other service documentation between the applicable Bank and the Movants relating to such accounts; and

(g)     authorizing the Banks to charge and collect, and authorizing and directing the Movants to pay, the prepetition and postpetition service charges and other fees and expenses to which the Banks are entitled under the terms of their account agreements and/or other service documentation with the Movants;

67.     I believe that by using the existing Bank Accounts, the Movants will avoid unnecessary expense and delay, which will disrupt the ordinary financial affairs and business operations of the

Movants, delay the administration of the their estates, and increase the costs to their estates.

68. Prior to the Petition Date and in the ordinary course of business, the Movants maintained their own separate cash management systems (each a "Cash Management System" and together the "Cash Management Systems"). Both of the Movants' Cash Management Systems allow for funds to be collected into one operating account and thereafter those funds are disbursed to various other accounts to pay operating expenses. Flow charts depicting both of the Movants' Cash Management Systems are attached to the Cash Management Motion as Exhibit 1.

69. The Movants' Cash Management Systems employ a series of integrated financial accounts, including centralized operating accounts, which are generally maintained at PNC Bank and which receive cash from various sources. The cash maintained in the operating accounts is used to fund day-to-day operations, including payments to construction vendors, marketing vendors, debt service, and other accounts payable.

As of the Petition Date, both of the Movants' Cash Management Systems employed three (3) bank accounts (collectively, the "Bank Accounts") with the following financial institutions (collectively with any other institutions with which the Movants maintain or establish deposit accounts or investment accounts, the "Banks"): (a) PNC Bank; and (b) Sovereign Bank.

70. The table attached to the Cash Management Motion as Exhibit 2 sets forth for each of the Bank Accounts the Movants maintain, the name of the institution at which the account is maintained, the account number (last four digits only) and a description of the purpose of the account. The Movants manage their cash receipts, transfers and disbursements through the Bank Accounts. In doing so, the Movants routinely deposit, withdraw and otherwise transfer funds to, from and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. On a daily basis, the Movants process large numbers of transactions through

their Cash Management Systems. The Movants maintain current and accurate records of all transactions processed through their Cash Management Systems.

71.    I believe that the relief requested in the Cash Management Motion will help to ensure the Movants' orderly entry into and administration in chapter 11 and avoid many of the possible disruptions and distractions that could divert the Movants' attention from more pressing matters during the initial days of these chapter 11 cases.

72.    Given the size and complexity of the Movants' business operations, any disruption of their accounting and cash management procedures would be enormously burdensome and disruptive, and could adversely impact the Movants' efforts to reorganize. At this critical juncture, the Movants must be able to conduct "business as usual" to the extent possible. To this end, it is essential that the Movants be permitted to continue to use their existing Cash Management Systems and Bank Accounts.

73.    In light of these factors, I believe that the Movants should be permitted to maintain their investment practices.

## CONCLUSION

74.    For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions. I reserve the right to supplement this affidavit with testimony and exhibits.

75.    I declare under penalty of perjury that the foregoing is true and current.

_Paul Rundell_

Paul Rundell

Subscribed and sworn to before me
this 17th day of June, 2010

My commission expires:

_20 January 2014_

Notary Public. State of ___IL___

MAUREEN G. WENER
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
January 20, 2014