Vincent P. Slusher
State Bar No. 00785480
vincent.slusher@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Thomas R. Califano
New York State Bar No. 2286144
thomas.califano@dlapiper.com
Jeremy R. Johnson
New York State Bar No. 4307617
jeremy.johnson@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501

Proposed Attorneys for Lincolnshire Campus, LLC and Naperville Campus, LLC,
Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 10-34176** |
| | § | |
| **LINCOLNSHIRE CAMPUS, LLC, *et al.*** [1] | § | **Chapter 11** |
| | § | |
| **Debtors.** | § | **Joint Administration Pending** |

## MOTION OF LINCOLNSHIRE CAMPUS, LLC AND NAPERVILLE CAMPUS, LLC FOR ORDERS (I) APPROVING BID PROCEDURES AND PROVIDING CERTAIN PROTECTIONS TO SENIOR CARE DEVELOPMENT , LLC; AND (II) AUTHORIZING THE (A) SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND LEASES

Lincolnshire Campus, LLC, ("Lincolnshire"), Naperville Campus, LLC, ("Naperville"),

Monarch Landing, Inc. ("Monarch Landing"), and Sedgebrook, Inc. ("Sedgebrook" and

---

[1] The Debtors in these chapter 11 cases are (a) Lincolnshire Campus, LLC, Case No. 10-34176, (b) Naperville Campus, LLC, Case No. 10-34177, (c) Monarch Landing, Inc., Case No. 10-34179, and (d) Sedgebrook, Inc., Case No. 10-34178. A motion seeking joint administration of the Debtors' cases was filed on June 15, 2010.

collectively, the "Debtors") by their proposed attorneys, hereby move (the "Motion") this Court for entry of orders (I) approving bid procedures and providing certain protections to Senior Care Development, LLC ("SCD" or "Buyer"); and (II) authorizing (a) the sale of substantially all of the Debtors' assets, free and clear of all liens, claims and encumbrances and (b) the assumption and assignment of certain executory contracts and leases. In support of this Motion, the Debtors respectfully represent as follows:

## Preliminary Statement[2]

The Motion seeks entry of two orders: (a) an order approving the proposed Bid Procedures and providing certain bid protections to the proposed stalking horse bidder, including a Break-Up Fee of $1,500,000 which includes an Expense Reimbursement of $350,000; and (b) an order authorizing the sale of substantially all of the Debtors' assets to the Buyer for the proposed purchase price of $43,270,000 ($14,000,000 in cash and the remaining amount in assumed debt), or such other higher and better bid as may be obtained after implementation of the proposed Bid Procedures.

The Debtors believe that that the proposed Bid Procedures, including but not limited to the Break-Up Fee and Expense Reimbursement, are reasonable and necessary to maximize the return to the estates' creditors and the parties in interest. A sale of substantially all of the Debtors' assets is the most efficient way to protect the interests of their respective residents and the Debtors respectfully request entry of the proposed orders.

## Jurisdiction and Venue

1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[2] All terms used in the Preliminary Statement section shall have the meanings provided in this Motion.

2.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein is sections 105(a), 363, and 365 of title 11 of United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Standing Order Concerning Guidelines for Compensation and Expense Reimbursement of Professionals, for Early Disposition of Assets in Chapter 11 Cases, and for Motions and orders Pertaining to Use of Cash Collateral Post Petition Financing, dated December 21, 2000, issued by the Bankruptcy Court for the Northern District of Texas (the "Standing Order").

## The Chapter 11 Cases

4.    On June 15, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5.    The Debtors continue in the possession of their property and the management of their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.    No trustee, examiner or committee has been appointed in these cases by the United States Trustee.

## The Debtors' Business Operations

7.    During the past year senior living facilities, including the Debtors' facilities, have suffered substantial declines in sales and occupancy and have faced various obstacles in their construction and development as a result of the struggling economy, the weakened credit environment, limited access to capital, declining real estate values, among other things. Prospective senior residents are having difficulty selling their homes and have lost significant amounts of their retirement funds in the market, making it difficult, if not impossible, for them to move into or remain in senior housing facilities.

8.     As a result of these challenging market conditions, the Debtors and their direct parent company, Erickson Retirement Communities, LLC ("ERC") have suffered a substantial loss of revenue and lower than anticipated absorption rates. This in turn forced ERC and certain other of its related entities[3] to seek chapter 11 protection approximately nine (9) months prior to the Petition Date by filing for bankruptcy in this Court (Main Case No. 09-37010) (the "ERC Cases"). ERC's Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "ERC Plan") was confirmed on April 16, 2010. The ERC Cases are still pending before this Court.

9.     A detailed discussion of the Debtors' business model and operations is provided in the Affidavit of Paul Rundell in Support of First Day Motions of Lincolnshire Campus, LLC and Naperville Campus, LLC, dated June 18, 2010 (the "Rundell Affidavit") [Docket No. 9]. The Rundell Affidavit is incorporated by reference herein.

A.     The Debtors' Organizational Structure

10.     The Debtors are comprised of two landowners, Lincolnshire and Naperville, and two NFPs, Sedgebrook and Monarch Landing.

1.     Lincolnshire (Landowner)

11.     Lincolnshire is a Maryland limited liability company with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

12.     Lincolnshire's primary assets are: (a) the improved land located in Lincolnshire, Illinois upon which the Sedgebrook campus is constructed; (b) cash and cash equivalents in the

---

[3]   The Debtors in ERC's chapter 11 cases are: (a) Erickson Retirement Communities, LLC; (b) Ashburn Campus, LLC; (c) Columbus Campus, LLC; (d) Concord Campus GP, LLC; (e) Concord Campus, LP; (f) Dallas Campus GP, LLC; (g) Dallas Campus, LP; (h) Erickson Construction, LLC; (i) Erickson Group, LLC; (j) Houston Campus, LP; (k) Kansas Campus, LLC; (l) Littleton Campus, LLC; (m) Novi Campus, LLC; (n) Senior Campus Services, LLC; (o) Warminster Campus GP, LLC; and (p) Warminster Campus, LP.

amount of approximately $274,000; and (c) a lease agreement entered into between Lincolnshire and Sedgebrook, the not-for-profit organization that operates that operates the Sedgebrook campus.

13. Lincolnshire's primary liabilities are: (a) a community loan entered into between Lincolnshire and Sedgebrook in the amount of $73.5 million (the "Lincolnshire Community Loan"); (b) Special Service Area No. 1 Special Tax Bonds, Series 2004, in the amount of $14.3 million, issued by the Village of Lincolnshire, Lake County, Illinois; and (c) the refund of the $125 million Purchase Option Deposit in the event that the NFP does not purchase the community. Lincolnshire is indirectly liable for the Illinois Finance Authority Revenue Bonds, Series 2007A, and Variable Rate Demand, Series 2007B owed by Sedgebrook (the NFP).

2. Naperville (Landowner)

14. Naperville is a Maryland limited liability company with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

15. Naperville's primary assets are: (a) the improved land located in Naperville, Illinois upon which the Monarch campus is constructed; (b) cash and cash equivalents in the amount of approximately $333,000; and (c) a lease agreement entered into between Naperville and Monarch, the not-for-profit organization that operates the Monarch campus.

16. Naperville's primary liabilities are: (a) a community loan entered into between Naperville and Monarch in the amount of $35.8 million (the "Naperville Community Loan"); (b) Special Area No. 31 Special Tax Bonds, Series 2006, in the amount of $14.5 million, issued by the County of DuPage, Illinois; and (c) the refund of the $130 million Purchase Option Deposit in the event that the NFP does not purchase the community. Naperville is indirectly liable for the

Illinois Finance Authority Revenue Bonds, Series 2007A, and Variable Rate Demand, Series 2007B) owed by Monarch (the NFP).

### 3. Sedgebrook (NFP)

17.     The Sedgebrook campus, located in Lincolnshire, Illinois, opened in July 2005. Lincolnshire, the Landowner, leases the land and campus to Sedgebrook, the NFP that operates this community, pursuant to a Master Lease. The average monthly fee at this campus is $1,865.91, and the average initial entry deposit ("IED") is $273,291. As of the Petition Date, Sedgebrook had (a) 469 completed independent living units, 409 occupied units, and an eighty-seven percent (87%) occupancy rate of those independent living units; (b) 44 completed assisted living units, 10 residents, and a twenty-one point seven percent (21.7%) occupancy rate of those assisted living units; and (c) 44 completed skilled nursing units, 22 residents, and a forty-nine point seven percent (49.7%) occupancy rate of those skilled nursing units. It was originally anticipated that the Sedgebrook's facilities would include up to 1,392 independent living units, 96 assisted living units and 132 skilled nursing beds.

18.     Management of the Sedgebrook campus was not transferred to Redwood-ERC Senior Living Holdings, LLC, a Maryland limited liability company ("Redwood"), pursuant to the ERC Plan. Senior Living Retirement Communities, formerly known as ERC, has contracted with Redwood to manage the Sedgebrook campus.

### 4. Monarch Landing

19.     The Monarch Landing campus, located in Naperville, Illinois, opened in July 2006. Naperville, the Landowner, leases the land and campus to Monarch Landing, the NFP that operates this community, pursuant to a Master Lease. The average monthly fee at this campus is $1,752.88, and the average IED is $277,856. As of the Petition Date, Monarch Landing had (a)

360 completed independent living units, and (b) 257 occupied units and a seventy-one percent (71%) occupancy rate. It was originally anticipated that Monarch Landing would include up to 1,498 independent living units, 96 assisted living units and 132 skilled nursing beds.

20.     Management of the Monarch Landing campus was not transferred to Redwood pursuant to the ERC Plan. Senior Living Retirement Communities, formerly known as ERC, has contracted with Redwood to manage the Monarch Landing campus.

        B.      The Debtors' Prepetition Capital Structure

                1.     Lincolnshire

21.     In the order of priority, Lincolnshire's prepetition capital structure is as follows:

- Special Service Area No. 1 Special Tax Bonds, Series 2004, in the amount of $14.255 million, issued by the Village of Lincolnshire, Lake County, Illinois;

- The Lincolnshire Community Loan: To secure its obligations, Sedgebrook granted a security interest to Lincolnshire in the Residence and Care Agreements and IEDs. Lincolnshire's obligations are secured by a mortgage on the property in favor of the NFP; and

- Equity funding from ERC.

                2.     Naperville

22.     In the order of priority, Naperville's prepetition capital structure is as follows:

- Special Area No. 31 Special Tax Bonds, Series 2006, in the amount of $14.5 million, issued by the County of DuPage, Illinois, which were guaranteed by ERC;

- The Naperville Community Loan: To secure its obligations, Monarch Landing granted a security interest to Naperville in the Residence and Care Agreements and IEDs. Naperville's obligations are secured by a mortgage on the property in favor of the NFP; and

- Equity funding from ERC.

                3.     Sedgebrook

23.     The primary funding for the Sedgebrook campus is Project Bonds issued to Sedgebrook by the Illinois Finance Authority in a total amount of $137,145,000. The Project Bond debt is the obligation of Sedgebrook and not Lincolnshire. Lincolnshire, however, must return the purchase deposit refund to the bond trustee upon the occurrence of certain events.

4.     Monarch Landing

24.     The primary funding for the Monarch Landing campus is Project Bonds issued to Monarch Landing by Illinois Finance Authority in a total amount of $178,745,000. The Project Bond debt is the obligation of Monarch Landing and not Naperville. Naperville, however, must return the purchase deposit refund to the bond trustee upon the occurrence of certain events.

**The Selection of the Stalking Horse Bidder**

25.     Since the Petition Date, the Debtors have accelerated their marketing process and believe that SCD offer is the best available offer at this time. The Debtors and their professionals are hopeful that the Bid Procedures will result in a competitive bidding and auction process. However, in the event that no other qualified bids are received, the Debtors believe in the exercise of their business judgment that the compensation offered by SCD is reasonable.

26.     On April 29, 2010, CLW Realty Group, Inc. ("CLW") was retained to market the Monarch Landing and Sedgebrook assets for sale. CLW began marketing the Monarch Landing assets immediately and has been marketing the Sedgebrook assets since the Petition Date.

27.     As contemplated by the ERC Plan, prepetition, the Debtors were in the process of negotiating the potential sale of the Debtors' campuses and other facilities. The sale of substantially all of the Debtors' assets represents the only likely basis for emergence from Chapter 11. In connection with the proposed sale pursuant to Bankruptcy Code section 363, the

Debtors intend to confirm a liquidating plan of reorganization. A draft of the plan and disclosure statement will be filed before the hearing on this Motion.

28.     The Debtors and their professionals have extensively marketed Monarch Landing's assets both prepetition and postpetition, including during the ERC bankruptcy cases. The Debtors contacted approximately 103 potential strategic and financial buyers for Monarch Landing's assets and received twenty-seven (27) executed non-disclosure agreements. Approximately five (5) parties are conducting due diligence. The Debtors and their professionals have been marketing Sedgebrook's assets since the Petition Date and have already had discussions with numerous potential buyers.

29.     On June 18, 2010, the Debtors received a non-binding letter of intent from SCD and selected SCD to serve as the stalking horse bidder. The Debtors believe that the stalking horse bidder represents the highest and best offer for the Debtors' assets at this time. As of the date of this Motion, SCD is the only party to provide a letter of intent.

30.     Upon receipt of the non-binding letter of intent, SCD, the Debtors and their respective professionals cooperated to draft the Asset Purchase Agreement (the "APA", a copy of which is attached hereto as Exhibit A) which the Debtors propose to use as the stalking horse bid (the "Stalking Horse Bid"). The material terms and conditions of the APA are summarized as follows:[4]

| | |
|---|---|
| **Buyer:** | Senior Care Development, LLC or its designee. |
| **Purchase Price:** | The total consideration payable by SCD will equal approximately $43,270,000 as follows: (a) cash in the amount of $14 million; (b) assumption of the Sedgebrook bonds in the amount of $14,515,000; and (c) assumption of the Monarch Landing bonds in the amount of $14,755,000. |

---

[4] This summary is qualified in its entirety by the APA. Capitalized terms used but not defined herein shall have the meanings provided in the APA.

| | |
|---|---|
| **Deposit:** | SCD has provided a good-faith deposit in the amount of $2,000,000. The return of the Deposit will be governed by the APA and applicable orders of this Court. |
| **Purchased Assets:** | (a) SCD shall purchase all assets of Monarch Landing, free and clear of all Liens and Liabilities (except for Assumed Liabilities to be assumed by SCD Naperville and the Liens securing such Liabilities), any and all assets and properties of Monarch Landing of every kind and description, relating to or comprising the Retirement Community commonly known as "Monarch Landing," wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including held or used by Monarch Landing or which in relation thereto Monarch Landing has any right, title or interest, including, without limitation, all cash collateral securing or relating to any Assumed Liability, all IEDs, all real property, all Community Specific IP, all Permits, to the extent transferable pursuant to applicable law, all related architects and engineers plans and specifications, and all Transferred Contracts to which Monarch Landing Owner is a party, but not including any Excluded Assets. |
| | (b) SCD shall purchase from Sedgebrook, free and clear of all Liens and Liabilities (except for Assumed Liabilities to be assumed by SCD Lincolnshire and the Liens securing such Liabilities), any and all assets and properties of Sedgebrook Owner of every kind and description, relating to or comprising the Retirement Community commonly known as "Sedgebrook," wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, held or used by Sedgebrook or which in relation thereto Sedgebrook Owner has any right, title or interest, including, without limitation, all Cash Collateral , all Initial Entrance Fee Deposits, all real property, all Community Specific IP, all Permits, to the extent transferable pursuant to applicable law, all related architects and engineers plans and specifications, and all Transferred Contracts to which Sedgebrook Owner is a party, but not including any Excluded Assets |
| **Excluded Assets:** | The following assets shall be excluded from the Sale: (a) cash and cash equivalents (other than Cash Collateral and Initial Entrance Fee Deposits); (b) equity securities of, and other ownership interests of any kind in, any entities; (c) all Contracts other than the Transferred Contracts (the "Excluded Contracts"); (d) Organizational Documents and minute books; (e) Permits and residents' records, if any that a Seller is prohibited by applicable Law from transferring to SCD or its affiliates; (f) personnel records for Employees who are not Transferred Employees ("Retained Employees") and, to the extent the transfer of such records (whether directly or by means of the sale of a Transferred Landowner) to SCD or its affiliates is prohibited by applicable Law, for Transferred Employees; and (g) all employee compensation and benefit plans, programs, policies and arrangements; and all Excluded Assets shall be retained by Debtors. |
| **Access:** | (a) At all times prior to the Closing Date, the Debtors shall, and (in the case of the Landowners) shall cause their Affiliates to, permit SCD and its counsel and other professional advisors to have reasonable access to the Business to perform due diligence, to examine the Contracts, books, records and other information of the Business, and make, or have made, copies thereof; provided, however, that such access shall be during normal business hours, upon reasonable prior notice and in a manner so as not to |

interfere with the normal business operations of the Business.

| | |
|---|---|
| **Closing Conditions:** | Conditions precedent to closing include, but are not limited to: |

(a) the Debtors shall have performed in all material respects all obligations required to be performed by each of them under this APA at or prior to the Closing; including, without limitation that the Purchased Assets are conveyed free and clear of all Liens, subject only to the Assumed Liabilities and Permitted Encumbrances;

(b) no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that does,

(c) there shall not have occurred any event, change or circumstance that could reasonably be expected to constitute a Material Adverse Effect with respect to the Retirement Communities; provided, however, that the SCD Parties acknowledge and agree that no Material Adverse Effect on the Retirement Communities shall be deemed to arise from the filing of the Bankruptcy Case or the Reorganization Plans;

(d) with respect to each Retirement Community, all Development Contracts and Management Agreements existing as of the Execution Date shall have been terminated. (f) the Debtors shall have received all necessary consents and approvals to assignment for all material contracts related to the business;

(e) all third Persons whose Approval is necessary under any Contract or applicable Law (i) for the consummation of the Transactions or (ii) for SCD to own and operate the Business following the Closing (including all Approvals identified in Part 5.4 of the SL Disclosure Schedule and all approvals, consents, authorizations, waivers or notifications from any Person necessary to authorize, approve or permit SCD to own and operate the Business), shall have given such Approval in writing, or the Bankruptcy Court shall have entered orders binding such persons in lieu of such Approvals;

(f) such terms and conditions as are custom in transactions of this type, including, without limitation, representation and warranties, among other things, as to the accuracy of all information provided to Buyer, no material adverse change, title to assets, corporate existence, power and authority, subsidiaries, compliance with laws and regulations (including environmental regulations), stability of labor relations, absence of material litigation, and accuracy of financial statements and information;

| | |
|---|---|
| **Executory Contracts and Unexpired Leases:** | On or before 7 days prior to the Closing, SCD shall provide (i) documentation indentifying all Contracts SCD wishes to be assumed by the Debtors and assigned by the Debtors to SCD at Closing; (ii) documentation identifying all Contracts that SCD may, at a later date, wish to be assigned by the Debtors (the "Designated Contracts"); and (iii) all Contracts that SCD will not be seeking to be assigned by the Seller (the "Excluded Contracts"). At any time between the Closing and the 60th day following the Closing, SCD may, upon not less than 7 days' prior notice to the Debtors, re-designate any Designated Contract as either a Transferred Contract or an Excluded Contract. The Debtors agree not to reject any Contract on or before the 60th day following the Closing except for Excluded Contracts. SCD shall be responsible for any payments that arise under any Designated Contract prior to SCD's re-designation of any such Designated Contract as an Excluded Contract. Seller shall assume in the Bankruptcy Case, any Transferred Contract that is designated by SCD to |

the Debtors on or before the 60th Day following the Closing, provided that SCD shall pay all cure amounts in connection with such assumption, and assign said Transferred Contracts to SCD. The proposed assignments shall take place pursuant to an order of the Court.

**Payment of Expense Reimbursement**

The Debtors will be required to pay the Expense Reimbursement if:

(a) there has been a material breach by the Debtors of any representation or warranty in an amount in excess of $1,000,000 or a material breach by any Seller in the due and timely performance of any covenant or agreement;

(b) if the Closing shall not have occurred on or before October 15, 2010 by reason of the failure of any condition precedent under Section 8.1 (unless such failure was primarily within the control of SCD);

(c) if the Court Approval shall not have been obtained by October 15, 2010, or the Confirmation Order has been entered but stayed as of such date or has not become a Final Order within ten (10) Business Days thereafter (unless such delay or stay results from an action or failure to act by SCD);

(d) if any condition precedent under shall have become incapable of fulfillment other than as a result of breach by SCD, and such condition is not waived by SCD;

(e) if any Seller has filed any pleading or entered into any agreement (other than this Agreement and other than the Bidding Procedures Motion) relating or otherwise regarding (A) the sale, transfer, lease or other disposition, directly or indirectly, of a material portion of the Purchased Assets or (ii) a proposed plan of reorganization that is inconsistent with the terms of this Agreement;

(f) if any Debtor has filed any pleading or entered into any agreement (other than this Agreement and other than the Bidding Procedures Motion) relating or otherwise regarding (A) the sale, transfer, lease or other disposition, directly or indirectly, of a material portion of the Purchased Assets or (ii) a proposed plan of reorganization that is materially inconsistent with the terms of this Agreement.

**Payment of Bid Protections**

Payment of the Break-Up Fee will occur

(a) upon the consummation of a sale to a higher and better bidder in accordance with the Bidding Procedures Order and such sale is authorized by the Bankruptcy Court; or

(b) or if the Debtors consummate a sales transaction related to the Purchased Assets with a third party pursuant to a procedure other than as contemplated in the Bidding Procedures Order.

**Non-Solicitation**

(a) Except as authorized, directed or otherwise permitted by the Bidding Procedures Order (or, prior to the issuance of the Bidding Procedures Order, in furtherance of the sale process reasonably anticipated to be authorized by said order), none of the Debtors will directly or indirectly (i) solicit, initiate, encourage, facilitate (including by way of furnishing

information) or take any other action designed to facilitate any inquiries or proposals regarding any merger, share exchange, consolidation, sale of assets, assumption of liabilities, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving any of Debtors that, if consummated, would constitute an Alternative Transaction; (ii) participate in any discussions or negotiations with third parties regarding an Alternative Transaction; or (iii) enter into any agreement regarding any Alternative Transaction.

(b) Except as authorized, directed or otherwise permitted by the Bidding Procedures Order (or, prior to the issuance of the Bidding Procedures Order, in furtherance of the sale process reasonably anticipated to be authorized by said order), the Debtors and Representatives will immediately cease and cause to be terminated any existing discussions or negotiations with any Persons (other than SCD) conducted heretofore with respect to any of the foregoing.

31. The terms of the Stalking Horse Bid are more fully explained in the APA and related documents.

## The Proposed Bid Procedures

32. This section summarizes key provisions of the Bid Procedures.[5] Capitalized terms used, but not defined in this section, shall have the meanings provided in the Bid Procedures. The descriptions of the Bid Procedures herein are qualified in their entirety by reference to the Bid Procedures attached to the Bid Procedures Order as Exhibit 1.

Participation Requirements. Any person desiring to submit a bid for the all or part of the Debtors' assets (a "Potential Bidder") will be required to deliver the following (the "Participation Requirements") to the Debtors : (1) an executed confidentiality agreement in form and substance satisfactory to the Debtors; and (2) satisfactory written evidence of available funds or a firm commitment for financing sufficient for the Potential Bidder to consummate the Sale Transaction. The financial information and credit-quality support of any Potential Bidder must demonstrate the financial capability of the Potential Bidder to timely consummate the Sale Transaction pursuant to a Qualified Bid (as defined below).

Due Diligence. All Potential Bidders that satisfy the Participation Requirements will be offered reasonable due diligence until the Auction.

Bid Deadline. The bid deadline shall be September 8, 2010 at 5:00 p.m. (prevailing Central Time). Bids must be received on or before that date by (1) counsel for Lincolnshire and Naperville, DLA Piper LLP (US), 1251 Avenue of the Americas, New

---

[5] All dates proposed in this Motion are subject to the Court's calendar and will, assuming this Motion is granted, be finalized at the hearing on the Bid Procedures.

York, NY 10020, Attn: Thomas R. Califano (thomas.califano@dlapiper.com) and DLA Piper LLP (US), 1717 Main Street, Dallas, TX 75201, Attn: Vincent Slusher (vince.slusher@dlapiper.com); (2) CLW Real Estate Services Group, 4301 Anchor Plaza Parkway, Suite 400, Tampa, FL 33634 Attn: Allen McMurtry (amcmurtry@clwrg.com), (3) Alvarez & Marsal LLP, 55 West Monroe, Chicago, IL 60603, Attn: Paul Rundell (prundell@alvarezandmarsal.com); (4) counsel for Monarch Landing and Sedgebrook, McGuire, Craddock & Strother, P.C., 3550 Lincoln Plaza, 500 N. Akard Street, Dallas TX 75201, Attn: J. Mark Chevalier (mchevallier@mcslaw.com) and Whiteford, Taylor, and Preston LLP, Seven Saint Paul Street, Baltimore MD 21202, Attn: Martin Fletcher (mfletcher@wtplaw.com); (6) Sovereign Bank as Indenture Trustee, 75 State Street, Boston MA, 02109, Attn: Vicki Woodard (vwoodard@sovereignbank.com); (7) counsel for Senior Care Development, LLC, Hinckley Allen & Snyder, LLP, 20 Church Street, Hartford, CT 06103, Attn: William S. Fish, Jr., (wfish@haslaw.com); (8) the Office of the Illinois Attorney General, 100 West Randolph Street, Chicago, IL 60601; (9) the Office of the United States Trustee for the Northern District of Texas, 1100 Commerce, Room 9C60, Dallas TX 75242; and (10) counsel for any Official Committee of Unsecured Creditors appointed in these cases.

Bid Requirements. To be eligible to participate in the Auction, each bid and each Potential Bidder submitting such a bid must, in the Debtors' sole discretion:

> (1) offer to consummate the Sale Transaction on terms no less favorable to the Debtors than those set forth in a copy of the Purchase Agreement;

> (2) include a marked copy of the APA to show any proposed amendments thereto (the "Modified Agreement") and a clean and executed Modified Agreement;

> (3) include a statement that there are no conditions precedent to the bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

> (4) state that such offer is binding and irrevocable until the consummation of the Sale Transaction;

> (5) offer to pay a purchase price that is greater than $45,020,000, which is the purchase price contained in the APA ($43,270,000), plus the Break-Up Fee ($1,500,000), plus $250,000 (the "Initial Bid Increment") – no credit bidding shall be permitted;

> (6) disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;

> (7) include the names and contact information of members of the bidder who will be available to answer questions regarding the offer, including advisors and related parties;

> (8) include a good-faith deposit in immediately available funds in the amount of at least $2,000,000;

> (9) provide satisfactory written evidence of available funds or a firm commitment for financing sufficient to consummate the Sale Transaction;

> (10) agree to assume the Residence and Care Agreements;

> (11) contain no credit bid component.

Qualified Bidders and Bids. Potential Bidders who have satisfied the Participation Requirements will be deemed Qualified Bidders. Bids that contain all bid requirements, as determined by the Debtors, will be deemed Qualified Bids. No credit bids will be entertained. The Debtors reserve the right to waive noncompliance with any bid

requirement.

The Debtors will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid by September 10, 2010 at 5:00 p.m. (prevailing Central Time). The Buyer is deemed a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid in all respects.

Auction. If one or more Qualified Bids is received, the Debtors will hold an Auction on September 14, 2010 at the offices of DLA Piper, 1251 Avenue of the Americas, New York, NY 10020-1104 at 12:00 p.m. noon (prevailing Eastern Standard Time).] If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Buyer will be the Successful Bidder, the APA will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek approval of and authority to consummate the Sale Transaction contemplated by the APA. Only Qualified Bidders and their financial and legal advisors will be permitted to attend the Auction.

Immediately prior to the Auction, the Debtors will select the then highest and best bid (the "Baseline Bid") to serve as the starting point for the Auction. The bidding will start at the purchase and terms of the Baseline Bid and continue in increments of at least $250,000 in cash or cash equivalents.

The Debtors may conduct the Auction in the manner they reasonably determine, in their business judgment, will promote the goals of the bid process, will achieve the maximum value for all parties in interest and is not inconsistent with any of the provisions of these Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. Such rules will provide that (1) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; (2) all bids will be made and received in one room, on an open basis, and all other Qualified Bidders will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder will be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (3) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction.

Closing the Auction. The Auction shall continue until there is only one offer that the Debtors determine, subject to Bankruptcy Court approval, is the highest or best offer from among the Qualified Bidders (including the Buyer) submitted at Auction (the "Successful Bid"). The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the APA.

Immediately prior to the conclusion of the Auction, the Debtors shall (1) review each bid made at the Auction on the basis of financial and contractual terms and such other factors as may be relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction; (2) identify the Successful Bid; and (3) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the Successful Bidder and the amount and other material terms of the Successful Bid.

The Debtors shall also select the Back-Up Bid, which shall remain open and irrevocable until one (1) business day after the closing of the sale with the Successful Bidder. In the event that, for any reason, the Successful Bidder fails to close the transaction contemplated by the Successful Bidder, the Debtors may elect to regard the Back-Up Bid as the highest or best bid for the Purchased Assets, and the Debtors will be authorized to consummate the transaction contemplated by the Back-Up Bid without further order of the Bankruptcy Court.

33.     To induce Buyer to expend the time, energy and resources necessary to submit a stalking horse bid, the Debtors have agreed to provide, and to seek at this time this Court's approval of, certain bid protections provided to the Buyer pursuant to the APA. Under certain circumstances, the APA may be terminated and Buyer also may be entitled to payment of a break-up fee and expense reimbursement as provided by the APA. The proposed break up fee is $1,500,000 (the "Break-Up Fee") which includes an expense reimbursement of $350,000 (the "Expense Reimbursement"). The Break-Up Fee is only payable in the event that the Debtors consummate a sale to a higher and better offer.

34.     The Debtors propose to send a notice (the "Auction and Sale Notice" a copy of which is attached to the Bid Procedures Order as Exhibit 2) to all creditors and parties in interest, including all parties having expressed an interest in acquiring all or part of the Debtors' assets.

## Relief Requested

35.     As contemplated by the ERC Plan, prepetition, the Debtors anticipated selling substantially all of their assets in an orderly process post confirmation. Due to circumstances beyond the Debtors' control, the Debtors were forced to accelerate the sale process with respect to their assets. By this Motion, the Debtors respectfully request entry of two orders:

> (a)     an order (the "Bid Procedures Order", a copy of which is attached hereto as Exhibit B) approving the proposed bid procedures (the "Bid Procedures", a copy of which is attached as Exhibit 1 to the Bid Procedures Order); and
>
> (b)     an order (the "Sale Order", a copy of which is attached hereto as Exhibit C) authorizing (i) the sale of substantially all of the Debtors' assets to SCD, or such other higher and better bidder, pursuant to the terms of the Stalking Horse Bid free and clear of all claims, interests, liens or encumbrances not expressly assumed ("Encumbrances"), and (ii) the assumption and assignment of executory contracts and unexpired leases to SCD, or such other higher and better bidder.

36.     The Debtors and their professionals believe that the Bid Procedures and the proposed sale to SCD are fair and reasonable under the circumstances of these chapter 11 cases.

## The Basis for the Requested Relief

37.     The Debtors believe that cause exists to grant both orders being sought by this Motion.   The proposed Bid Procedures are reasonable and necessary to effectuate the sale process and provide sufficient notice and opportunity to permit other bidders to participate in the Auction process.   Upon conclusion of the Auction, the Debtors believe that sufficient cause exists to enter an order approving the proposed sale to the Stalking Horse Bidder, or such higher or better bidder that results from the Auction.

A.     The Proposed Bid Procedures Should be Approved.

38.     The Debtors believe it is in the best interests of their estates, creditors, residents and employees to commence a process for soliciting potential bidders to participate in the Auction.   The Debtors seek approval of the Bid Procedures in an effort to maximize the likelihood of higher and better bids being made for the Debtors' assets.   The Debtors believe that the Bidding Procedures will permit interested parties reasonable opportunities, consistent with the financial constraints of the Debtors, to evaluate whether to propose a bid for the Debtors' assets that is higher and better than the Stalking Horse Bid.

39.     Under Bankruptcy Rule 6004(f)(1), the Debtors may sell property outside the ordinary course of business by private sale or by public auction.   In this case, the Debtors believe that an auction will expose the assets to a broad and diverse market and ensure a sale to the highest and best offer.

40.     The Debtors desire to receive the greatest value for the assets.   Although the Debtors believe the APA represents a fair and reasonable offer and reflects the highest and best

value for the assets under these terms as of the date of this Motion, and although the assets were marketed both pre- and post-petition, the Debtors nevertheless desire to place the APA to the test of the broader public marketplace in the hope that higher and better offers are generated for all or portions of the assets.

41.     If the Bid Procedures are approved, the Debtors will solicit competing bids for the assets. The Bid Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders and the Debtors, the receipt, negotiation and qualification of bids received, the conduct of any auction, and the selection and approval of any ultimately successful bidders.

1.     The Proposed Bid Procedures Are Reasonable and Necessary.

42.     The Bid Procedures were developed consistent with the Debtors' competing needs to expedite the sale process and promote participation and active bidding. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the auction in a controlled, fair and open fashion.

43.     The Debtors believe that the Auction and proposed Bid Procedures will promote active bidding from seriously interested parties and will identify the best or highest offer(s) for the assets. The proposed Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors believe that the Bid Procedures are: (a) sufficient to encourage bidding for the assets; (b) consistent with other procedures previously approved by the Court; and (c) appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Further, the Bid

Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process.

44.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Il. 1995); In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N. Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

45.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. See, e.g., Integrated Res., 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

46.    The paramount goal in any proposed auction of property of the estate is to maximize the proceeds received by the estate. See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

47. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See, e.g., Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

48. The Debtors have sound business justifications for seeking approval of the Bid Procedures at this juncture. The Debtors believe it is in the best interests of their estates, creditors, residents and employees to commence a bidding procedure immediately, as the Debtors have limited funding and resources to try to maximize the value of their assets. In addition, the sale of the assets provides a realistic means for the continuation of certain resident care services for the Debtors' residents with minimal interruption and inconvenience. For these reasons, the Debtors have determined, based upon their business judgment, that the best option for maximizing the value of their estates for the benefit of their creditors, residents, employees and other parties in interest is through the Sale Transaction pursuant to the Bid Procedures.

49. The Debtors believe that the Bid Procedures will establish the parameters under which the Sale Transaction with Buyer may be tested at the Auction. The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates for their creditors, patients and employees. The proposed procedures contain terms typical for a process through which a sale of this nature is consummated and will increase

the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

50. As additional support, Bankruptcy Code section 105(a) provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Bid Procedures will greatly assist the Debtors in maximizing the value that they may obtain for all or portions of the assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstance.

### 2. The Bid Protections Are in the Best Interests of the Debtors' Estates.

51. To induce Buyer to expend the time, energy and resources necessary to submit a stalking horse bid, the Debtors have agreed to provide, and seek this Court's approval of, certain bid protections provided to the Buyer under the APA.

52. The Debtors have agreed to provide Buyer with the Break-Up Fee and the Expense Reimbursement (the "Bid Protections") as described in the Bid Procedures Order. Such protections are a material inducement for, and a condition of, Buyer's entry into the APA. The Debtors believe that the Bid Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by Buyer in connection with the transaction and (b) the fact that, if the Break-Up Fee is triggered, the Debtors will have closed on a higher or otherwise better offer for the assets, to the benefit of the Debtors' creditors, residents and employees.

53. Although bidding incentives in favor of a stalking horse are measured against a business judgment standard, to receive administrative expense priority pursuant to Bankruptcy Code section 503(b), the bidding incentive must provide some postpetition benefit to the estate.

See In re O'Brien Envtl Energy, Inc., 181 F.3d 527, 533 (3d Cir. 1999). The O'Brien court identified two instances in which such a benefit to the estate may be found. First, if the incentive promoted a more competitive bidding process, "such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Second, where bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as the floor bid on which other bidders can rely.

54. The amount of the Break-Up Fee and Expense Reimbursement in the APA is reasonable and appropriate in light of the size and nature of the transaction. Moreover, the Break-Up Fee and Expense Reimbursement are consistent with the O'Brien court's test above; these Bid Protections were a material consideration without which Buyer would not have entered into the APA. Additionally, Buyer required such Bid Protections as inducement to conduct the costly research necessary to provide a competitive floor bid.

55. The Debtors submit that the Bid Protections are normal, and oftentimes necessary components of sales outside the ordinary course of business under Bankruptcy Code section 363. See e.g., In re Kupp Acquisition Corp., Case No. 96-1223 (PJW) (Bankr. D. Del. March 3, 1997); In re Kmart, Case No. 02-B-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders); In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the Debtor's estate, of substantial benefit to the Debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break-up fee).

56.     In sum, the Debtors' ability to offer the Bid Protections to the Buyer enables the Debtors to ensure the sale of substantially all of the assets to the Buyer at a price they believe to be fair while, at the same time, providing the Debtors with the potential of even greater benefit to the estates. Thus, the Bid Protections should be approved.

57.     Moreover, payment of the Bid Protections will not diminish the assets of the estates available for distribution to creditors, because, as stated above, the Debtors will only be required to make payments in accordance with the Bid Protections if the Debtors consummate a sale with an alternative bidder that exceeds the consideration offered by Buyer by an amount sufficient to pay the Break-Up Fee.

58.     Finally, in the event the Debtors do accept a higher and better offer and therefore pay the Break-Up Fee, SCD will provide a statement satisfying all of the conditions to payment of the Break-Up Fee as set forth in this Court's Standing Order. A schedule setting forth the Debtors' twenty largest creditors as required by the Standing Order is attached as Exhibit D hereto.

### 3.     Justification Exists to Prohibit Credit Bidding.

59.     Justification exists to prohibit credit bidding.     Section 363(k) of the Bankruptcy Code codifies the secured creditor's right to credit bid with respect to asset sales conducted outside the ordinary course of business. See Matter of Tampa Bay Associates, Ltd., 864 F.2d 47 (5th Cir. 1989). Specifically, section 363(k) provides that:

> [a]t a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k) (emphasis added).

60.     Under the plain language of section 363(k), a creditor's right to credit bid may

be abrogated for "cause." 11 U.S.C. § 363(k). The term "cause" is not defined in section

363, but it is intended to be a flexible concept enabling a court to fashion an appropriate

remedy on a case-by-case basis. Further, the language of section 363(k) expressly allows the

bankruptcy court to place conditions upon a secured creditor's ability to credit bid. See In re

Philadelphia Newspapers, LLC, 599 F.3d 298, 305 (3d Cir. 2010) (finding that the right to

credit bid is not without limitations because the right exists "unless the court for cause orders

otherwise"); In re NJ Affordable Homes Corp., 2006 WL 2128624, at *16 (Bankr. D.N.J.

June 29, 2006). Findings that cause exists to disallow a secured creditor from credit

bidding can include:

> a.     "Cause" has also been found where the creditor has engaged in
> misconduct. See, e.g., In re Antaeus Techn. Servs., 345 B.R. 556 (Bnkr.
> W.D. Va. 2005) (credit bid disallowed where secured creditors' conduct
> was viewed as not merely protecting the value of its collateral, but
> enhancing its position); In re Aloha Airlines, Inc., No. 08-00337, 2009
> WL 1371950 (Bankr. D. Hawaii, May 14, 2009) (disallowed credit bid
> because the party making it had entered into an agreement with third party
> that had engaged in misconduct with respect to the debtors).

> b.     Courts have determined "cause" existed as a result of a lack of benefit
> to the estate. See In re Diebart Bancroft, 1993 WL 21423 (E.D. La. 1993)
> (finding "cause" to reject a secured creditor's "credit bid" because it failed
> (a) to bring needed cash into the debtor's estate and (b) to comply with the
> terms of the bidding procedures order, which required the posting of a
> deposit by a date certain.); In re WPRV-TV, Inc., 983 F.2d 336 (1st Cir.
> 1993) (where secured creditor "bid would yield little benefit to the estate
> and other creditors, the trustee was well within its discretion in not
> recommending the [credit] bid for confirmation"); In re Theroux, 169 B.R.
> 498, 499 (Bankr. D.R.I. 1994) (observing that "there was no absolute
> entitlement to credit bid" and finding "cause" in "blatant inadequacy of the
> price.").

> c.     Courts have found "cause" to exist where there is a dispute over the
> validity of a lender's lien, or uncertainty over how to permit credit bidding
> where there are multiple assets and multiple liens. See In re Akard Street
> Fuels, L.P., 2001 WL 1568332, *3 (N.D. Tex. Dec. 4, 2001) (The court
> approved bidding procedures that denied a secured creditor the right to

credit bid concluding that only the debtor would be prejudiced if it were compelled to wait (without new cash) the "comparatively lengthy period of time that would be necessary to resolve the complex dispute surrounding the challenged liens."); In re McMullen, 196 B.R. 818 (Bankr. W.D. Ark. 1996) (holding that a creditor would not be entitled to credit bid any of its alleged liens or security interests at a trustee's sale "because the validity of its liens and security interests [were] unresolved."); In re Fontainebleau Las Vegas Holdings, LLC, No. 09-21481 (Bankr. S.D. Fla. Dec. 7, 2009) (denying motion to allow credit bidding at a 363 sale because the court had insufficient time prior to the sale to determine the amount and priority of the more than 300 lien claims. Thus, the court found "cause" to deny credit bidding, noting that delaying the sale was not in the best interest of creditors because the value of the debtors' property to be sold was eroding.); In re Takeout Taxi Holdings, Inc., 307 B.R. 525, 536 (Bankr. E.D. Va. 2004) (stating a credit bid may be denied for cause upon objection of creditors holding liens equal in priority to liens held by party seeking to credit bid, because, in such cases there would be no cash proceeds from the sale available for distribution to the objecting lien holders).

61.     Here, cause clearly exists to deny secured creditors the right to credit bid based all three criteria.

a.   Creditor misconduct:  As discussed in the Rundell Affidavit, these chapter 11 cases were caused by the bond trustee's breach of the forbearance agreement and performing a cash sweep against the Debtors' bank accounts.  Notwithstanding their agreement to forbear under the terms of the ERC Plan, the bond trustee's conduct requires a filing to protect the interests of the residents and other creditors.  Their conduct has created potential claims which is the subject of the Debtors' proposed motion for a 2004 examination.  These claims could result in a partial or complete equitable subordination of the bond trustee's claims, but it may take considerable time to make such determinations.

b.  No benefit to the estate:  A credit bid by the bond trustees would result in no cash proceeds to the estates.  Accordingly, there can be no benefit to permitting a credit bid.

c.  Nature, extent and validity of liens:  The Debtors' chapter 11 cases are relatively complex and it is not clear to what extent a credit bid would or could be applied to the landowner or NFP bankruptcy cases.  In addition, if the estate has equitable subordination claims against the bond trustee as a result of their prepetition misconduct, the remedy for the equitable subordination claims may affect the nature, extent and validity of the liens.

62.     In addition to a cause-based denial of a right to credit bid, the recent decisions in Philadelphia Newspapers and Pacific Lumber hold that in a plan-based sale (as opposed to a section 363 sale) the procedures may be structured to prevent a secured creditor from credit bidding on its collateral. In re Philadelphia Newspapers, LLC, 599 F.3d 298 (3d Cir. 2010); In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009).     Both courts held that notwithstanding Bankruptcy Code section 1129(b)(2)(A)(ii), which permits secured creditors the right to credit bid under a plan-based sale, a plan may alternatively permit the sale of the creditor's collateral under subsection 1129(b)(2)(A)(iii) without credit bidding protection if the secured creditor receives the "indubitable equivalent" of its claim under the plan. See id.; see also In re CRIIMI MAE, Inc., 251 B.R. 796, 807-08 (Bankr.D.Md. 2000) (holding that confirmation of a reorganization plan was not precluded due to the fact that the debtors proposed a sale without affording a creditor the opportunity to credit bid where the plan otherwise provided the creditor with the indubitable equivalent of its claim).

63.     Accordingly, the Bid Procedures do not permit credit bidding.

### 4.     The Assumption of the Residence and Care Agreements is Necessary

64.     The requirement that Qualified Bids must contain an agreement to assume the Residence and Care Agreements is necessary in order to ensure the equitable treatment and well-being of the Debtors' residents as a failure to do so could result in adverse consequences to those residents.  For example, in In re Covenant at South Hills, Inc., Case No. 09-20121 (Bankr. W.D.Pa. 2009), the Bankruptcy Court for the Western District of Pennsylvania approved a sale of a CCRC to a purchaser that was unwilling to assume that debtor's residence and care agreements.  The result for the debtor's residents in that case was disastrous and saw residents lose the entirety of their initial-entry deposits, while allowing

the buyer to do away with the significant amenities such as a kosher kitchen in an effort to cut costs. By requiring all Qualified Bids to assume the Residence and Care Agreements, such an inequitable result will be avoided entirely and should therefore be approved.

B.      The Sale Order Should Be Approved.

1.      The Proposed Sale is an Exercise of Sound
Business Judgment and Should Be Approved.

65.      The Debtors submit that ample authority exists for the approval of the proposed sale of the assets to the Buyer pursuant to the APA. Bankruptcy Code section 363, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business, provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate...." 11 U.S.C. § 363(b)(1).

66.      Although Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have held that approval of a proposed sale of property pursuant to section 363(b) is appropriate if the transaction represents the reasonable business judgment of the debtor. See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); see also In re Delaware & Hudson Rv. Co., 124 B.R. 169,176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a Chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith."); Stephens Indus. Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986).

67.     If a valid business justification exists for the sale, as it does in this case, the Debtors' decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Therefore, parties objecting to the Debtors' proposed Sale Transaction must make a showing of "bad faith, self-interest or gross negligence." Id. at 656; see also Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

68.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  See, e.g., In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987).  The proposed Sale Transaction satisfies all these factors.

69.     First, the Debtors have proposed the Sale Transaction after thorough consideration of all viable alternatives and have concluded that the sale is supported by a number of sound business reasons.  A sale is critical to maintaining the going concern value of the Debtors' business operations.  In particular, the Debtors submit that the facts described above, which require a prompt sale of the assets to preserve value for this estate, provide a strong

business justification for the Sale Transaction. The maximization of asset value for the benefit of creditors reflects a sound business purpose that warrants authorization of the proposed Sale Transaction.

70. Second, the Debtors will provide notice of the Bid Procedures as provided in the Bid Procedures Order, including notice to creditors, potential bidders and other parties in interest. The Debtors submit that such notice constitutes adequate and reasonable notice to interested parties. In addition to the extensive noticing contemplated by this Motion, the Debtors also participated in a comprehensive marketing process and have retained CLW to market the assets.

71. Third, the value the Debtors will receive for the assets as a going concern by entering into the APA, or through such other purchase agreement(s) between the Debtors and the successful bidder, exceeds any value the Debtors could get for the assets if the Debtors were required to liquidate their assets piecemeal, while maintaining appropriate services for residents. As of the date of this Motion, no other entity or group of entities has provided a definitive offer to purchase the assets for greater economic value to the Debtors' estates than the Stalking Horse Bid from the Buyer, which is particularly telling given the Debtors' prepetition marketing efforts.

72. Finally, as described in more detail below, the Sale Transaction and APA were negotiated in the utmost good faith and at arm's length.

73. For the foregoing reasons, the Debtors submit that approval of the Sale Transaction and the APA and all related transactions are appropriate and warranted under Bankruptcy Code section 363.

2. The Proposed Sale Should Be Free and Clear of all Encumbrances.

74.    The Debtors further submit that it is appropriate to sell the assets free and clear of all encumbrances, pursuant to Bankruptcy Code section 363(f), with any such encumbrances attaching to the net sale proceeds of the assets, as and to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)    if such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

75.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Debtors' assets "free and clear" of liens and interests. Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); In re Dundee Equity Corp., 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

76.     The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply. See In re Trans World Airlines. Inc., 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)"); see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11").

77.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the assets pursuant to the APA.  Moreover, any lienholder also will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors for the sale of the assets to the Buyer in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.  Accordingly, section 363(f) authorizes the sale and transfer of the assets free and clear of any such encumbrances.[6]

---

[6]  The Buyer shall have no successor liability for any claims against the Debtors.  Courts have consistently held that the purchaser of a debtor's assets under Bankruptcy Code section 363 takes such assets free and clear of successor liability resulting or arising from pre-existing claims.  Such successor liability-type claims would frustrate the purpose of an order authorizing the sale of estate assets free and clear of all "interests."  Accordingly, the purchasing parties should not be subject to further claims related to the Debtors' pre-Sale conduct.  See e.g. Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 91 (2d Cir. 1988) (channeling of claims to proceeds of sale consistent with intent of sale free and clear under Bankruptcy Code section 363(f)); Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.), 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property pursuant to Bankruptcy Code section 363(f) was made free and clear of Title VII employment discrimination and civil rights claims of debtors' employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D. R.I. 1985) (transfer of liquor license pursuant to Bankruptcy Code section 363(f) was made free and clear of any interest permissible even though estate had unpaid tax liability);American Living Sys. v. Bonapfel (In re All American of Ashburn, Inc.), 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor liability doctrine where assets were sold free and clear pursuant

### 3.   The APA Was Negotiated at Arms Length and In Good Faith.

78.   The terms of the APA were negotiated at arm's length, without collusion, and in good faith. Accordingly, the Debtors request that the Court determine the Buyer to have negotiated and acted at all times in good faith and, as a result, be entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code and that the APA does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code.

79.   Furthermore, the Debtors submit that the APA represents substantial value to the Debtors' estates inasmuch as it provides favorable terms for the disposition of the assets for fair and reasonable consideration. See Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635 (3d Cir.1991) (reasonably equivalent value under the Bankruptcy Code), cert. denied, 503 U.S. 937 (1992); see Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139 (3d Cir. 1996) (same); Salisbury v. Texas Commerce Bank-Houston, N.A. (In re WCC Holding Corp.), 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994) (reasonably equivalent value under Texas law) (citing Besing v. Hawthorne (In re Besing), 981 F.2d 1488, 1495 (5th Cir.), cert. denied. 510 U.S. 821 (1993) and Southmark Corp. v. Riddle (In re Southmark Corp.), 138 B.R. 820, 829 (N.D. Tex. 1992)); In re China Resource Prod. Ltd. v. Favda Intern., Inc., 856 F. Supp. 856, 866 (D. Del. 1994) (fair consideration under Delaware law) (quoting Gever v. Ingersoll Publications Co., 621 A.2d 784, 792 (Del. Ch. 1992)).

80.   The Buyer is the operator of other CCRCs and senior living facilities and is not affiliated with the Debtors. The Debtors submit that all parties have acted in good faith throughout the negotiations. It is contemplated that the Buyer may assume certain employment contracts with insiders of the Debtors, but such employment arrangements will be disclosed prior

---

to Bankruptcy Code section 363(f); aff'd sub. nom., Griffen v. Bonapfel, 805 F.2d 1515 (11th Cir. 1986).

to a sale hearing. See In re Integrated Resources. Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992), appeal dismissed by 3 F.3d 49 (2d Cir. 1993) (employment discussions between debtor's management and prospective buyer did not taint sale process so as to negate the application of the business judgment rule to the propriety of the sale transaction).

81.     Based upon the foregoing, the Debtors submit that to preserve and maximize the value of their estates, the sale of the assets pursuant to the APA (or a higher or better offer) is an exercise of sound business judgment, is in the best interests of the Debtors and their estates, and should be approved in all respects.

4.     The Debtors Should Be Permitted to Enter the APA.

82.     Courts routinely approve entry into asset purchase agreements. See, e.g., In re Enron Corp., 2002 WL 32154269, at \*4 (Bankr. S.D.N.Y. Apr. 24, 2002). Such agreements are approved if they are an exercise of the debtor's sound business judgment. See, e.g., In re Decora Indus., Inc., 2002 WL 32332377, at \*5 (Bankr. D. Del. May 17, 2002); In re Arlco, Inc., 239 B.R. 261, 265 (Bankr. S.D.N.Y. 1999). In this case, the APA was the subject of intense arm's-length negotiations between the Debtors and Buyer, and the Debtors submit that the terms and conditions of the APA are the best that could be obtained under the Debtors' circumstances, and that entry into the APA is a sound exercise of the Debtors' business judgment.

5.     Assumption and Assignment of Assumed Contracts Is Authorized
        by Bankruptcy Code Section 365

83.     Bankruptcy Code Sections 365(a) and (b) authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. 11 U.S.C. § 365(a) and (b); In re Jamesway Corp., 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996). Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
>> (A)  cures or provides adequate assurance that the trustee will promptly cure, such default;
>>
>> (B)  compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>>
>> (C)  provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

84.    The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.  See, e.g., In re Group of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co., 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

85.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  See In re Paolo Gucci, 193 B.R. 411, 414 (S.D.N.Y. 1996); see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.),

872 F.2d 36, 40 (3d Cir. 1989); In re III Enter., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet.").

86.     In the present case, the Debtors' assumption and assignment of the Assigned Contracts to the Buyer meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the APA will provide significant benefits to the Debtors' estates. Because the Debtors cannot obtain the benefits of the APA without the assumption of the Assigned Contracts, the assumption of these Assigned Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

87.     Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

88.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG

Midtown South Corp. v. McLaren/Hart Environmental Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993).

89.    Here, the Buyer has agreed to pay all cure amounts in connection with the Assigned Contracts. The Buyer has sufficient assets to continue performance thereunder and at the hearing on cure amounts, the Buyer will demonstrate to the satisfaction of the Bankruptcy Court that adequate assurance of future performance is present by the promise to perform the obligations of the Assigned Contracts from and after the Closing Date. Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

90.    To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtors also request that the Bankruptcy Court enter an order providing that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of Bankruptcy Code section 365(f).

91.    Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(l).

92.    Section 365(f)(l), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co.,

Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

93.     Other courts have recognized that provisions that have the effect of restricting assignments also cannot be enforced. See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Designated Contracts and be deemed and

found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

> (vii). The Sale Transaction Should Be Considered "Under a Plan" For Purposes of Bankruptcy Code Section 1146(a).

94.    To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtors also request that the Bankruptcy Court enter an order providing that anti-assignment provisions in section 1146(a) of the Bankruptcy Code provides that:

> [t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of [the Bankruptcy Code], may not be taxed under any law imposing a stamp or similar tax.

11 U.S.C. § 1146(a).

95.    The proposed sale of the assets pursuant to the terms and conditions contained herein constitutes a transfer in furtherance of a plan.    A liquidation plan is being filed contemporaneously with this Motion.  The plan process will proceed along a dual track with the sale motion.

96.    The Debtors will notice appropriate taxing authorities regarding the proposed relief.

> C.    Cause Exists for Waiver of the Stay Imposed by Bankruptcy Rule 6004(h).

97.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property. . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease...is stayed until the expiration of [14] days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

98.     The Debtors request that any order entered pursuant to the Motion authorizing the consummation of a transaction that is deemed a sale of assets and/or an assignment of an unexpired lease be effective immediately by providing that the 14-day stay under Rules 6004 or 6006, as the case may be, is inapplicable, so that they may proceed to close on the transaction as expeditiously as possible and within the time frames contemplated by the Debtors and the successful bidder(s).  Given the Debtors' liquidity position and the danger of losing going concern value, as discussed above, the Debtors respectfully submit that it is in the best interests of their estates to close the sale as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby request that the Court eliminate the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

99.     Notice of this Motion has been provided to (a) the Office of the United States Trustee for the Northern District of Texas; (b) the Debtors' twenty largest unsecured creditors on a consolidated basis; and (c) counsel Senior Care Development, LLC.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

WHEREFORE, the Debtors respectfully request that the Court enter orders substantially in the form annexed hereto as Exhibits B and C, (I) approving bid procedures and providing certain protections to Senior Care Development, LLC; (II) authorizing (a) the sale of substantially all of the Debtors' assets free and clear of all liens, claims and encumbrances to the Buyer or such other higher or better bidder and (b) the assumption and assignment of certain executory contracts and leases, and (III) granting such other and further relief as is just and proper.

Dated: June 24, 2010
       Dallas, Texas

**DLA PIPER LLP (US)**

By: /s/ Vincent P. Slusher

Vincent P. Slusher
State Bar No. 00785480
vincent.slusher@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Thomas R. Califano
thomas.califano@dlapiper.com
Jeremy R. Johnson
jeremy.johnson@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 835-6000
Fax: (212) 835-6001

Proposed Attorneys for Lincolnshire Campus, LLC
Naperville Campus, LLC, Debtors and Debtors in
Possession