J. Mark Chevallier, State Bar No. 04189170
James G. Rea, State Bar No. 24051234
McGUIRE, CRADDOCK & STROTHER, P.C.
2501 N. Harwood, Suite 1800
Dallas, TX 75201
(214) 954-6800 Telephone
(214) 954-6850 Facsimile
Email: mchevallier@mcslaw.com
Email: jrea@mcslaw.com

and

Martin T. Fletcher, MD Bar No. 07608
Stephen F. Fruin, MD Bar No. 08456
Thomas J. Francella, Jr., DE Bar No 3835
WHITEFORD, TAYLOR AND PRESTON, L.L.P.
Seven Saint Paul Street
Baltimore, MD 21202
(410) 347-8700 Telephone
(410) 752-7092 Facsimile
Email: mfletcher@wtplaw.com
Email: sfruin@wtplaw.com
Email: tfrancella@wtplaw.com

PROPOSED ATTORNEYS FOR SEDGEBROOK, INC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. : 10-34178** |
| | § | |
| **SEDGEBROOK, INC.,** | § | **CHAPTER 11** |
| | § | |
| **Debtor.** | § | |

## DEBTOR'S EMERGENCY MOTION TO
## APPROVE INTERIM AND FINAL ORDERS
## (I) AUTHORIZING THE USE OF CASH COLLATERAL
## (II) GRANTING ADEQUATE PROTECTION TO SECURED CREDITORS
## AND (III) SCHEDULING FINAL HEARING

724075

Sedgebrook, Inc., the debtor and debtor in possession in the above-captioned case ("Sedgebrook" or the "Debtor"), through counsel, files this emergency motion (the "Motion") for an order approving Interim and Final Orders Authorizing the Use of Cash Collateral, Granting Adequate Protection and scheduling a Final Hearing, and in support thereof states:

## INTRODUCTORY STATEMENT

1.      By this Motion, the Debtor requests the entry of an interim Order (the "Interim Order") and a final Order (the "Final Order") authorizing the Debtor to, among other things, (i) use cash collateral pursuant to section 363 of 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") of the Debtor's asserted secured creditors, consisting of: (a) holders (the "Bondholders") of the Series 2007A and 2007B Illinois Finance Authority Revenue Bonds (the "IFA Revenue Bonds"); and (b) Sovereign Bank,; as lead bank for a syndicate of lenders who are the issuers of a letter of credit to the bond trustee for the benefit of the Bondholders of the Series 2007B IFA Revenue Bonds (the "Letter of Credit"), securing certain of the Debtor's obligations with respect to the Bondholders (Sovereign Bank and the Bondholders are, together, the "Secured Creditors"); in accordance with the forty-five-day budget prepared by the Debtor (the "Budget"); and (ii) grant adequate protection pursuant to sections 361, 362 and 363 of the Bankruptcy Code to the Secured Creditors. A copy of the Budget is attached hereto as **Exhibit A**.

2.      The Debtor requires the use of cash collateral on an emergency basis because it needs funds necessary to satisfy its ordinary course of business cash needs including, working capital, liquidity needs, payroll obligations and other routine payables. In addition, the Debtor needs cash to fund this chapter 11 case and to successfully reorganize. The Secured Creditors assert liens on all of the Debtor's cash and cash proceeds and assert that all such cash and proceeds are "cash collateral" as that term is defined in 11 U.S.C. §363.

## JURISDICTION

3.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334. This is a core proceeding pursuant to 11 U.S.C § 157(b). Venue of these cases and the

Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The relief sought with this Motion is predicated upon sections 105(a), 361, 362,

363, 1107 and 1108 title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the

"Bankruptcy Code").

## BACKGROUND

### A.     The Chapter 11 Reorganization Proceedings

5.     On June 15, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.

6.   The Debtor intends to continue in the possession of its property and the management

of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy

Code.

7.     No creditors' committee has been appointed in this case by the United States

Trustee.

### B.     Related Chapter 11 Proceedings

8.     Contemporaneous with the filing of the Debtor's case, Lincolnshire Campus, LLC

("Lincolnshire"), filed a petition for relief under Chapter 11 of the Bankruptcy Code in this Court

Case No. 10-34176 (SGJ).  The Debtor leases its principal Facility (defined below) from

Lincolnshire and has various financial as well as contractual relationships with Lincolnshire.

9.     Approximately nine (9) months prior to the Petition Date, Lincolnshire's parent

corporation, Senior Living Retirement Communities, LLC, formerly known as Erickson

Retirement Communities, LLC ("Senior Living"), and certain other of its related entities[1] filed

for bankruptcy in this Court (Main Case No. 09-37010). Senior Living developed and managed

the Facility for the Debtor. Senior Living's Chapter 11 Plan was confirmed on April 16, 2010

("Senior Living's Plan"). Senior Living and its related entities cases are still pending before this

Court.

## C. The Debtor and Its Business Operations

10. The Debtor was established on July 18, 2003, as a Maryland nonstock corporation

to operate a continuing care retirement community in Lincolnshire, Illinois (the "Facility"),

which opened in July, 2005. The Debtor is classified as a Internal Revenue Code Section

501(c)(3) organization based on its mission to provide affordable senior housing to seniors. The

Debtor is a supported organization of National Senior Campuses, Inc. ("NSC"), a not-for-profit

organization organized to support the Debtor and 16 other not-for-profit organizations that

operate Continuing Care Retirement Communities ("CCRCs"). NSC is the sole member of the

Debtor and appoints all of the members of the Debtor's board of directors.

11. The Facility and NSC's other CCRCs are designed to offer seniors a continuum of

care during their retirement years from independent living to skilled nursing care on the same

campus. These facilities provide affordable living accommodations and related healthcare and

support services to a target market of middle-income seniors aged sixty-two (62) years and older.

---

[1] The Debtors in Senior Living's chapter 11 cases are: (i) Erickson Retirement Communities, LLC; (ii) Ashburn Campus, LLC; (iii) Columbus Campus, LLC; (iv) Concord Campus GP, LLC; (v) Concord Campus, LP; (vi) Dallas Campus GP, LLC; (vii) Dallas Campus, LP; (viii) Erickson Construction, LLC; (ix) Erickson Group, LLC; (x) Houston Campus, LP; (xi) Kansas Campus, LLC; (xii) Littleton Campus, LLC: (xiii) Novi Campus, LLC; (xiv) Senior Campus Services, LLC; (xv) Warminster Campus GP, LLC; and (xvi) Warminster Campus, LP.

12.     Senior Living was the developer of the Facility. Senior Living and its affiliates are not related to or affiliated with the Debtor or NSC. The Debtor has entered into a master lease agreement and certain other agreements with Lincolnshire. In addition, the Debtor and Senior Living have entered into a management and marketing agreement (the "Management Agreement"), pursuant to which Senior Living it to manage the community. As of April 30, 2010, pursuant to a transitional subcontract agreement, Senior Living subcontracted its right and obligations under the Management Agreement to Erickson Living Management, LLC ("ELM"), which is presently managing the Debtor's Facility (the "Transitional Subcontract Agreement"). In return for its management services, the Debtor pays ELM a monthly management fee, per the Management Agreement. The Debtor also reimburses ELM for the costs of: (a) marketing the re-occupancy of the units at the Facility; (b) the salary and benefits of the Debtor's employees and ELM's management personnel located at the Facility, and (c) the Debtor's share of certain other centralized services.

13.     The Debtor enters into a residence and care agreement (the "Residence and Care Agreement") with each individual resident entering a community, pursuant to which the Debtor collects an initial entrance deposit ("IEDs") and monthly fees from each resident. As of the Petition Date, the Facility had (i) 469 completed independent living units, 409 residents, and an percent eighty-seven (87%) occupancy rate. It was originally anticipated that the Debtor's facilities would include up to 1,392 independent living units, 96 assisted living units and 132 skilled nursing beds.

14.     The Debtor's capital structure consists of permanent financing in the form of project bonds and special tax district bonds (Lincolnshire is primarily liable for the special tax district bonds). The Debtor has very low operating margins compared to the cost of the program

and staffing. In addition, construction costs of the Facility have been much higher than other CCRCs. Further, there is significant competition in the greater Chicago area, which, together with that area's higher unemployment rate and declining home prices, has caused the Facility's occupancy rate to increase at a rate lower than originally forecast, thereby causing the Debtor to have problems selling units as well as significant liquidity and capital structure difficulties.

### D. Existing Indebtedness

15. The Debtor's existing asserted pre-petition indebtedness is comprised of (i) existing bond debt, and (ii) certain additional unsecured obligations.

a. Existing Bond Debt. The Debtor has existing asserted pre-petition debt in the form of the IFA Revenue Bonds in the original issued aggregate amount of $137,145,000. Of this amount, it is asserted that approximately $135,855,000 in principal remains outstanding. The IFA Revenue Bonds are comprised of 2 series, Series A and Series B Bonds. The Series A consist of $98,145,000 of tax-exempt fixed rate term bonds with a final maturity date in 2042. Series B Bondholders consist of $39,000,000 of tax exempt variable rate demand bonds with a final maturity date in 2042. A Debt Service Reserve Fund was established from the proceeds of the Project Bonds in the amount of $9,089,985 which represents the maximum annual debt service on the outstanding Series 2007 Bonds. The Series 2007A bonds have a stated interest rate of 5%. The average annual interest rate for the Series 2007B bonds was 2.22% and 3.45% as of December 31, 2008 and 2007, respectively. The Sovereign Letter of Credit is an irrevocable transferable direct-pay letter of credit was issued by Sovereign in the initial stated amount of $39,500,000. Of this amount, $37,894,387.08 supports the face value of the Series 2007B bonds. Included in the total is 22 days of accrued interest in the amount of

$124,387.08. The Letter of Credit expires on December 27, 2012. The documents related to the IFA Revenue Bonds and the Sovereign Letter of Credit include the following:

    i.    The Trust Indenture (the "Trust Indenture") between the Illinois Finance Authority (the "IFA") and Manufacturers and Traders Trust Company ("MTTC"), as Trustee, dated August 1, 2007;

    ii.    The Loan Agreement between the IFA and the Debtor (the "IFA Loan Agreement"), dated August 1, 2007;

    iii.    The Fee and Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing (the "Mortgage") among the Debtor, Lincolnshire Campus, LLC and the IFA, dated August 1, 2007;

    iv.    The Assignment of Fee and Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing (the "Mortgage Assignment") by the IFA to MTTC, dated August 1, 2007;

    v.    The Collateral Assignment by the Debtor to MTTC (the "Collateral Agreement"), dated August 1, 2007;

    vi.    The Letter of Credit Agreement (the "LOC Agreement") and related Letter of Credit issued by Sovereign Bank in favor of MTTC securing the Debtor's obligations to the 2007B Series Bondholders, dated August 1, 2007.

Collectively, the foregoing are referred to herein as the "Secured Creditors' Loan Agreements."

    b.    Unsecured Obligations. In addition to the foregoing, there are claims against the Debtor existing as of the Petition Date in the approximate amount of $410,000

## Sources of Cash Collateral

16.     The Debtor's cash is currently on deposit in numerous accounts, on which cash the Secured Creditors claim a lien (the "Cash Collateral"). A portion of these funds are in accounts not controlled by the Secured Creditors (the "Operating Accounts"). Any liens asserted by the Secured Creditors on the Operating Accounts are not perfected and, thus, subject to avoidance pursuant to Chapter 5 of the Bankruptcy Code. As of June 15, 2010, the amount available for use by the Debtor in the Operating Accounts is approximately $7,000,000. The Debtor also has an "Escrow Funds" account. The Escrow Funds are amounts that are maintained in a separate account as a reserve required under applicable Illinois. The amount of cash on deposit related to the Escrow Funds as of June 14, 2010 is approximately $3,674,000.

17.     In addition to the Operating Accounts and the Escrow Funds are the following limited use reserve accounts established pursuant to the Trust Indenture that may be subject to the control of the Bond Trustees:

        a)      Development Funds.  The amount of cash on deposit related to the Development Funds as of June 14, 2010 is approximately $1,429,000.

        b)      Debt Service Reserve Funds. The amount of cash on deposit related to the DSR Funds as of June 14, 2010, is approximately $8,783.000.

        c)      Interest Funds.The amount of cash on deposit related to the Interest Funds as of June 14, 2010 is approximately $4,201,000.

        d)      Operating Reserve Funds.  The amount of cash on deposit related to the Operating Funds as of May 31, 2010, is approximately $1,623,000.

        e)      Restricted Funds.  The amount of cash on deposit related to the Restricted Funds as of June 14, 2010. is approximately $1,036,000.

f)       Supplemental Account. The supplemental account was established as part of the forbearance agreement to hold resident initial entrance deposits. The amount of cash on deposit in the Supplemental Account as of June 14, 2010 is approximately $1,539,000.

## Events Leading to Chapter 11 Filing

18.      The senior housing market has been hindered over the last few years by a weakened credit environment, including limited access to capital, falling real estate values, and significantly reduced liquidity due to realized and unrealized losses on investments. New senior housing units under construction have significantly declined since 2004. New units under construction in 2008 totaled 15,862, compared to 20,775 units in 2007, a twenty-four percent (24%) decline.

19.      Senior living facilities have experienced substantial declines in occupancy as a result of the market changes. Prospective residents are faced with (i) difficulty selling their homes due to uncertainty in value and (ii) significant declines in their equity portfolio value. This has made it difficult, if not impossible, for seniors to move into or remain in senior housing facilities such as the Debtor's.

20.      These market conditions have contributed to decreased revenue and lower than anticipated absorption rates at the Debtor's Facility. In addition, the Debtor's Facility is not yet mature and, as a result, it is not cash flow positive at this point in time.

21.      As mentioned previously, the Debtor leases the Facility from Lincolnshire (which ERC owns, directly or indirectly) pursuant to the Master Lease.

22.      Under the terms of the Plan, U.S. Bank, as bond trustee for the Facility (the "Bond Trustee") was to negotiate in good faith with the Debtor and Redwood-ERC Senior

Living Holdings, LLC, a Maryland limited liability company ("Redwood"), regarding the possible sale of the Facility as well as two other related facilities, Monarch Landing, Inc. ("Monarch") and Linden Ponds, Inc. to Redwood during the 90-day period following the confirmation of the Plan (*i.e.* from April 30, 2010 through July 31, 2010) (the "Negotiation Period").[2] Although the Bond Trustee had an obligation to negotiate in good faith during the Negotiation Period, approximately two weeks prior to the Petition Date, the bond trustee for Monarch, inappropriately effectuated a set-off against the Monarch's cash reserves in the amount of $15,166,737.69. The action of Monarch's bond trustee has threatened to destabilize Monarch's operations. As a number of the Debtor's bond owners are the same as Monarch's and they both are represented by the same counsel, the Debtor filed this Chapter 11 proceeding to stop its bond trustee from making a similar offset against Sedgebrook's cash reserves and thereby causing severe damage to its operations and, thereby, threatening the well being of its residents.

---

[2] Section 6.2.3.1 of the Plan provides:

> *Disposition.* During the 90-day period immediately following the Plan Confirmation Date, Redwood will negotiate (non-exclusively) in good faith with the applicable NFPs and Bond Trustees for the Bond Communities to reach a resolution regarding such Bond Communities. During such 90-day period, the applicable NFP, with the consent of the applicable Bond Trustee, may market the applicable Bond Community for sale with the consent of the applicable Bond Trustee and letter of credit provider, may consummate such sale. At the conclusion of the 90-day period, if the parties have reached a resolution with respect to a particular Bond Community then the Debtors will facilitate a definitive agreement regarding such a resolution for such Bond Community. If Redwood does not reach an agreement with respect to resolution of a particular Bond Community during this 90-day period that is acceptable to Redwood, the applicable NFP, the letter of credit provider and the applicable Bond Trustee, then promptly at the end of such 90-day period, ERC's interests in the entity related to such Bond Community (Naperville Campus, LLC, Linconshire Campus, LLC and/or Hingham Campus, LLC, as applicable will be transferred to the applicable NFP.

10

## Relief Requested

23.     By this Motion, the Debtor seeks the entry of an order, inter alia, authorizing the

Debtor to use the Cash Collateral in the Operating Accounts, upon the limitations set forth in the

Budget. The material provisions of the proposed use of cash collateral are set forth in the

following sections of the proposed order granting the relief sought herein:

(a)     Debtor.     Sedgebrook, Inc.

(b)     Use of Cash Collateral.     The Secured Creditors to date have not
consented to the use of their Cash Collateral. The Debtor seeks to use Cash
Collateral in the Operating Accounts pursuant to the limitations set forth in the
Budget.

(c)     Adequate Protection. The Secured Creditors shall be provided with the
following adequate protection under the Order: (i) a replacement lien on all
postpetition assets of the Debtor pursuant to § 361 of the Bankruptcy Code to the
extent of diminution in the value of the Secured Creditors' interest in Cash
Collateral, and (ii) an administrative priority expense claim pursuant to § 507(b)
of the Bankruptcy Code, to the extent there is a diminution in the value of the
Secured Creditors' interest in Cash Collateral. *See* Order at 5. The adequate
protection shall not include a lien on or recoveries from Avoidance Actions
(defined below).

(d)     Carve-Out. To the extent unencumbered funds are not available to pay
administrative expenses in full, the Adequate Protection granted hereunder to the
Secured Creditors shall be subject only to payment of the Carve-Out. As used in
the Interim Order, the term "Carve-Out" means the following: (a) the unpaid fees of
the Clerk of the Court and the United States Trustee pursuant to 28 U.S.C.
§ 1930(a); and (b) the aggregate accrued and unpaid fees and expenses payable
under Bankruptcy Code sections 330 and 331 to professionals retained pursuant to
an order of the Court by the Debtor and any statutory committee which may be
appointed in these cases. For purposes of a Final Order approving the use of Cash
Collateral, in addition to the Carve-Out provided under the Interim Order shall also
include ) the aggregate accrued and unpaid fees and expenses payable under
Bankruptcy Code sections 330 and 331 to professionals retained pursuant to an
order of the Court by the Debtor and any statutory committee which may be
appointed in these cases, not to exceed (i) all approved fees paid to such
professionals during any period in which the Debtor is authorized to use Cash
Collateral and (ii) all approved fees of such professionals not paid during a period
in which the Debtor is authorized to use Cash Collateral, in an amount not to
exceed $500,000. See Order at 6.

724075                                          11

(e)    Waiver of Applicable Nonbankruptcy Law Relating to Perfection on Property of the Estate or on the Foreclosure or Other Enforcement of Liens. The Order is deemed to be sufficient and conclusive evidence of the priority, perfection, and validity of the post-petition liens and security interests granted therein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording or possession of the subject collateral, or other act to validate or perfect such security interest or lien. *See* Order at 6-7.

(f)    Modification of the Automatic Stay. The automatic stay provisions of Section 362 of the Bankruptcy Code are modified and vacated to the extent necessary to permit the Secured Creditors to perform any act authorized or permitted under the Order, including, without limitation, to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Secured Creditors' collateral. See Order at 7.

## BASIS FOR RELIEF

A.    **Legal Standard**

24.    The Debtor's use of property of its estate is governed by Bankruptcy Code section

363, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

25.    Bankruptcy Code section 363(c)(2)(B) permits a debtor to use cash collateral with the consent of this Court. Bankruptcy Code section 363(e) requires a debtor to adequately protect the secured creditors' interest in property to be used by a debtor against any diminution in value of such interest resulting from the debtor's use of the property during the chapter 11 cases.

26.    What constitutes sufficient adequate protection is decided on a case-by-case basis. See In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984); In re

Swedeland Dev. Group. Inc., 16 F.3d 552, 564 (3d Cir. 1994); In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Columbia Gas Sys., Inc., 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992). By requiring adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in its collateral during the period of use by the debtor in possession. See Glasstream Boats, 110 B.R. at 613; George Ruggiere Chrysler-Plymouth, 727 F.2d at 1019; In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Hubbard Power & Light, 202 B.R. 680 (Bankr. E.D.N.Y. 1996). Adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens and administrative claims.

## B. Emergency Need for Use of Cash Collateral

27. A debtor's cash "is the life's blood of the business," and the bankruptcy court must ensure that cash "is available for use even if to a limited extent." In re Mickler, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Courts typically authorize a debtor to use cash collateral to continue its operations so long as the interest asserted by any affected secured creditor in such cash collateral is adequately protected. Thus, courts are required to balance the debtor's need to use cash collateral in its reorganization effort against the secured creditor's need for adequate protection. Stein v. U.S. Farmers Home Admin. (In re Stein), 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982). In ruling whether a secured creditor is adequately protected early in a case, courts "will generally permit the business operation to continue, at least to the point of plan formulation, if

the debtors make a solid evidentiary showing to support their projections[.]" In re Dynaco Corp., 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

28.     Consistent with these principles, courts repeatedly have recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. See, e.g., Dynaco, 162 B.R. at 394 (granting a motion for the use of cash collateral and stating that "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary in order to operate a business"); Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc. (George Ruggiere Chrysler-Plymouth, Inc.), 727 F.2d 1017, 1020 (11th Cir. 1984) (allowing debtor to use cash collateral over secured creditor's objection after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1399 (10th Cir. 1987) (permitting debtor to use cash collateral after finding that there was only a low risk that secured creditor's interest would diminish).

29.     In this case, the Debtor has a vital need to use Cash Collateral. Because the Debtor has no funds other than Cash Collateral, the Debtor has no ability to operate its business without the use of Cash Collateral. Without access to Cash Collateral, the Debtor will not be able to operate the Facility, service its residents, pay vendors, or fund payroll. The inability to do any of these would cause immediate and irreparable harm to the Debtor and its estate.

30.     The Debtor requires access to the Cash Collateral in order to continue to operate. Unless the Debtor can immediately use the Cash Collateral, the Debtor and its residents will be irreparably harmed because the Debtor will be unable to operate and manage its business.

Moreover, the over 400 residents of the Debtor's retirement community will be left without essential services, which could potentially lead to harmful situations for the senior residents, who rely on such services for their daily living requirements. The Debtor requires Cash Collateral for the payment of, among other things, wages, salaries, operating expenses, inventory purchases, equipment and supply purchases and numerous other expenses incurred in the daily operation of the facilities in the Debtor's community.

31.     The Debtor's operations depend on the funds generated by the monthly fees charged to residents by the Debtor (a portion of which is used to fund the Debtor's operations) along with the income generated by the IED's. Maintaining services for existing residents and obtaining new residents is essential for the Debtor's survival and ability to generate additional income. The Debtor's use of Cash Collateral to continue to provide services to residents will protect the value of the underlying collateral by creating more of an income stream through IED's and monthly fees to fund operations. This, in turn, helps to maintain the value of the Secured Creditors' collateral.

32.     The alternative to allowing access to the Cash Collateral is "to force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of all classes of creditors and other constituencies involved in this case." Dynaco Corp., 162 B.R. at 396. This harsh outcome would be catastrophic and would stand in diametrical opposition to the rehabilitative purpose of chapter 11.

33.     The Debtor, therefore, seeks immediate authority to use the Cash Collateral as set forth in the Motion and in the form Interim Order to prevent immediate and irreparable harm to the Debtor's estate pending the Final Hearing pursuant to Bankruptcy Rule 4001(c).

34.     Accordingly, as the Debtor requires the use of Cash Collateral, the Debtor submits that it has satisfied the requirements of Bankruptcy Rule 6003 to support immediate Cash Collateral availability.

## C.     Adequate Protection for Secured Creditors

35.     As noted above, a debtor's authority to use cash collateral is typically conditioned on providing "adequate protection" to secured creditors that assert an interest in such cash. "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in [Bankruptcy Code section 361 of the Bankruptcy Code]." In re Beker Industrial Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Section 361 identifies various types of adequate protection, including cash payments, additional liens, replacement liens and such other relief that will result in the realization by the secured creditor of the "indubitable equivalent" of its interest in its collateral. 11 U.S.C. § 361.

36.     The determination of adequate protection is a fact-specific inquiry that is to be made on a case-by-case basis. See, e.g., MBank, 808 F.2d at 1396-97 (the determination is a question of fact "which is to be decided flexibly on the proverbial 'case-by-case' basis") (citing Martin, 761 F.2d at 474); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (the determination "is left to the vagaries of each case"). See also In re Royal d'Iberville Corp., 10 B.R. 37, 39 (Bankr. S.D. Miss. 1981) ("Opinions as to what is adequate protection must be determined on a case-by-case basis and opinions will vary greatly from court-to-court because adequate protection is not defined in the Bankruptcy Code."). Furthermore, in determining adequate protection, "[t]he equities in each case must be weighed in striking a balance." Stein, 19 B.R. at 459.

37.     The focus of the adequate protection requirement is to preserve the secured creditor's position at the time of the bankruptcy filing and protect the secured creditor from diminution in the

value of its collateral during the reorganization process. See Mosello, 195 B.R. at 288; Beker, 58 B.R. at 736. See also In re WorldCom, Inc., 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy.").

38.     In this case, the adequate protection proposed by the Debtor will fully protect the Secured Creditors. The Debtor proposes to provide the Secured Creditors with the following adequate protection to the extent of diminution in the value of the Secured Creditors' interest in Cash Collateral:

(a)     The Debtor proposes to provide the Secured Creditors with the adequate protection replacement liens in and upon all prepetition and postpetition assets and properties (tangible, intangible, real, personal and mixed), whether now existing or newly acquired or arising, and wherever located, including, without limitation, all receivables, other than actions pursuant to Chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), all Cash Collateral, and all cash and non-cash proceeds, substitutions, accessions and profits of all of the foregoing. This replacement lien would attach to IEDs received postpetition that are not subject to any existing lien pursuant to § 552 of the Bankruptcy Code; and

(b)     Subject to the Carve-Out for certain professional fees and administrative expenses, the Secured Creditors will receive a superpriority expense claim as provided in Bankruptcy Code section 507(b); provided, however, that such superpriority administrative expense claim shall not be satisfied from recoveries or proceeds of Avoidance Actions.

39.     Based on the foregoing, the Debtor submits that the proposed adequate protection will fully protect the Secured Creditors from any diminution in the value of their interest in the

Cash Collateral and is fair, reasonable and sufficient to satisfy the requirements of the Bankruptcy Code. Accordingly, the adequate protection proposed herein and in the Cash Collateral Orders is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

## D. The Requirements of Bankruptcy Rules 4001(c)(2) and 6003(b) Have Been Satisfied

40. Pursuant to Bankruptcy Rule 4001(c)(2), a minimum of 15 days notice is required before a final hearing on this Motion may take place. The same rule, however, also provides that the Court "may conduct a hearing before such 15-day period expires, but . . . may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(c)(2).

41. In addition, Bankruptcy Rule 6003(b) provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition," grant relief upon "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate[.]" FED. R. BANKR. P. 6003(b).

42. As set forth above, the Debtor has an immediate and urgent need to use Cash Collateral. Absent the use of Cash Collateral, the Debtor will not be able to meet its working capital and liquidity needs, and its estates and creditors will suffer immediate and irreparable harm. Accordingly, the Debtor submits that the requirements of Bankruptcy Rules Rule 4001(c)(2) and 6003(b) have been satisfied.

## E. The Carve-Out

43. With the inclusion of the Carve-Out, the Cash Collateral Orders do not directly or indirectly deprive the Debtor's estate or other parties in interest of possible rights and powers by

restricting the services for which professionals may be paid in these cases.  See In re Ames Dept. Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  In Ames, the court found such "carve-outs" for professional fees to be not only reasonable, but necessary to ensure that official committees and debtors' estates can have assistance from counsel.  See id. at 41. The Adequate Protection is expressly subject and subordinated to the Carve-Out, as described above.

### F.     The Court Should Schedule a Final Hearing.

44.     Pursuant to Bankruptcy Rule 4001(b)(2), The Debtor requests that the Court schedule a final hearing on the Motion as soon as practicable, but in no event later than 45 days following the entry of an interim order, and fix the date prior to the final hearing for the filing of objections to the Motion.

### The Automatic Stay Should Be Modified on a Limited Basis

45.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and superpriority claims described above with respect to the Secured Creditors, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.

46.     Stay modifications of this kind are ordinary and standard features for the use of cash collateral, and in the Debtor's business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

47.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

48.     The Debtor has an urgent and immediate need for the continued use of cash to continue to operate on an uninterrupted basis. Without the continued use of the Cash Collateral, the Debtor does not have sufficient funds with which to operate its business on an ongoing basis. Absent authorization from the Court to use Cash Collateral, as requested, on an interim basis pending a final hearing on the Motion, the Debtor will be immediately and irreparably harmed. The availability of the use of cash collateral will provide necessary assurance to the Debtor's vendors, employees, residents and potential future residents of its ability to meet its near-term obligations and provide the services the Debtor's residents rely upon. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtor's business, to the detriment of all parties in interest. Accordingly, the interim relief requested herein is critical to preserving and maintaining the going concern value of the Debtor and facilitating its reorganization efforts.

## NOTICE

49.     Notice of this Motion has been provided to (a) the Office of the United States Trustee; (b) the Debtor's 20 largest unsecured creditors on a consolidated basis (until an official committee of unsecured creditors is appointed and has retained counsel, in which event, such

committee's counsel); (c) counsel to the Bond Trustee; (d) counsel to Senior Living Retirement Communities, LLC; (e) counsel to Erickson Living Management, LLC; (f) Sovereign Bank, N.A., as issuing party of the letter of credit; and (g) those persons who have formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice is necessary or required.

WHEREFORE, the Debtor requests that the Court:

(a)     Enter an order authorizing the interim use of Cash Collateral, substantially in the form submitted herewith, granting the relief requested in this Motion;

(b)     Schedule a Final Hearing on the Motion;

(c)     Enter a Final Order authorizing the final use of cash collateral as requested in the Motion; and

(d)     Grant such other and further relief as is just and appropriate under the circumstances.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: June 18, 2010
Dallas, Texas

Respectfully Submitted,

MCGUIRE, CRADDOCK & STROTHER, P.C.

By: /s/ J. Mark Chevallier
J. Mark Chevallier, Texas Bar No.04189170
James G. Rea, Texas Bar No. 24051234
McGuire, Craddock & Strother, P.C.
2501 N. Harwood, Suite 1800
Dallas, TX 75201
(214) 954-6800 Telephone
(214) 954-6850 Facsimile
Email: mchevallier@mcslaw.com
Email: jrea@mcslaw.com

and

Martin T. Fletcher, MD Bar No. 07608
Stephen F. Fruin, MD Bar No. 08456
Thomas J. Francella, Jr., DE Bar. No. 03835
Whiteford Taylor and Preston, L.L.P.
Seven Saint Paul Street
Baltimore, MD 21202
(410) 347-8700 Telephone
(410) 752-7092 Facsimile
Email: mfletcher@wtplaw.com
Email: sfruin@wtplaw.com
Email: tfrancella@wtplaw.com

Proposed Attorneys for Sedgebrook, Inc.

## CERTIFICATE OF SERVICE

I certify that on the 18th day of June, 2010, a copy of the foregoing was sent by

electronic mail or First Class U.S. Mail, postage prepaid, on all parties on the attached service

list.

/s/J. Mark Chevallier

*1906308/v4*

Alpha Baking Company
36230 Treasury Center
Chicago, IL 60694

Architerra
239 US Hwy 45
Indian Creek, IL 60061

Becker Electrical Group Inc.
4210 43rd Avenue
Kenosha, WI 53144

Direct Supply Systems Inc.
PO Box 88201
Milwaukee, WI 53288-0201

Get Fresh Produce
1441 Brewer Creek Blvd
Bartlett, IL 60103

Gulf South Medical Supply
Attn Melanie Brewer
4345 South Point Blvd
Jacksonville, FL 32216

Healthcare Cosmetology Services Inc
PO Box 850243
Braintree, MA 02185

Hershey Creamery Company
301 S. Cameron Street
PO Box 1821
Harrisburg, PA 17105-1821

IKON Financial Services
Attn Donna Tanner Spec  Assets Dept
PO Box 6338
Macon, GA 31208-6338

Koeckritz International, Inc.
1400 Hicks Road
Rolling Meadows, IL 60008

Lencioni Wholesale Meats Inc.
1000 Brown Street
Wauconda, IL 60084

Linda Roberts & Associates Inc.
104 East Roosevelt Rd. Suite 201
Wheaton, IL 60187

Phase 2 Services
143 Briarwood North
Oak Brook, IL 60523

Richard H. Moche    [Email]
Mintz, Levin, Cohn, Ferris, Glovsky
and Popeo P.C.
1 Financial Center
Boston, MA 02111-2657

Sovereign Bank
Attn Brian Moran
3 Friends Lane, 2nd Floor
Newtown, PA 18940

Sun Office Products
15508 E. 19th Avenue
Aurora, CO 80011

Supreme Lobster
200 E. North Ave
Villa Park, IL 60181-1221

Sysco Food Services - Chicago
PO Box 5037
Des Plaines, IL 60017-5037

Universal Fleetcard
PO Box 70997
Charlotte, NC 28272-0997

U.S. Bank National Association
Corporate Trust Services    [Email]
Attn James E. Murphy
100 Wall Street
NY, NY 10005

Vigil Health Solutions
2102-4464 Markham St.
Victoria, BC V8Z 7X8
Canada

Waste Management
PO Box 4648
Carol Stream, IL 60197-4648

William W. Kannel    [Email]
Mintz, Levin, Cohn, Ferris, Glovsky
and Popeo, P.C.
1 Financial Center
Boston, MA 02111-2657

Sedgebrook, Inc.
701 Maiden Choice Lane
Baltimore, MD 21228

Office of the U. S. Trustee    [ECF mail]
1100 Commerce Street Rm 976
Dallas, TX 75242

Office of the Attorney General
c/o Cara Smith, Esq.    [Email]
100 West Randolph St.
Chicago, IL 60601

Illinois Department of Public Health
c/o Marc Gibbs    [Email]
535 W. Jefferson St.
Springfield, IL 62761

Vincent P. Slusher
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201

Thomas R. Califano/Jeremy R. Johnson
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104

Erickson Retirement Communities, LLC
701 Maiden Choice Lane
Catonsville, MD 21228

Fifth Third Bank As Agent
424 Church St., Suite 500
Nashville, TN 37219

Wells Fargo, Trustee
9062 Old Annapolis Road
Columbia, MD 21045

Privileged & Confidential

DIP Budget
Landowner
Not-For-Profit

Lincolnshire Campus LLC
Sedgebrook Inc.

| (In Thousands) | Week Ended Friday 6/18/2010 | Week Ended Friday 6/25/2010 | Week Ended Friday 7/2/2010 | Week Ended Friday 7/9/2010 | Week Ended Friday 7/16/2010 | Week Ended Friday 7/23/2010 | Total W/E 6/14/10 7/23/10 |
|---|---|---|---|---|---|---|---|
| **Not-For-Profit - Cash Flow** | | | | | | | |
| Settlements | | 1 | | | | 1 | 2 |
| Average Deposit per Settlement | 250 | 280 | 280 | 280 | 280 | 280 | 280 |
| Beginning Book Cash Balance | $ 7,907 | $ 7,017 | $ 7,455 | $ 7,008 | $ 7,069 | $ 6,486 | $ 7,001 |
| **Receipts** | | | | | | | |
| Other | - | - | - | - | - | - | - |
| Monthly Resident Fees | 426 | 438 | 47 | 170 | 110 | 438 | 1,630 |
| **Total Receipts** | 426 | 438 | 47 | 170 | 110 | 438 | 1,630 |
| **Disbursements - Operating** | | | | | | | |
| Central Services | | | | | | | |
| Central Services - Marketing | - | - | 83 | - | - | - | 83 |
| Salaries Wages and Benefits | 410 | - | 310 | - | 450 | - | 1,170 |
| Management Fees | - | - | - | - | - | - | - |
| Refunds | - | - | - | - | - | - | - |
| Other Expense (Food, Utilities) | - | - | 101 | 109 | 117 | 117 | 446 |
| **Total Operating Disbursements** | 410 | - | 494 | 109 | 567 | 117 | 1,698 |
| **Net Operating Income** | 16 | 438 | (447) | 61 | (458) | 321 | (69) |
| **Restructuring Disbursements** | | | | | | | |
| Professional Fees | - | - | - | - | - | - | - |
| Trustee Fees | - | - | - | - | - | - | - |
| Utility Deposits | - | - | - | - | 125 | - | 125 |
| DIP Fees & Interest | - | - | - | - | - | - | - |
| **Total Restructuring Disbursements** | - | - | - | - | 125 | - | 125 |
| **Financing Disbursements** | | | | | | | |
| Entrance Deposits | - | - | 280 | - | - | - | 280 |
| Escrowed Entrance Deposits | - | - | (280) | - | - | - | (280) |
| DIP Loan/(Repayments) | - | - | - | - | - | - | - |
| **Total Financing Disbursements** | - | - | - | - | - | - | - |
| **Net Cash Flow** | 16 | 438 | (447) | 61 | (583) | 321 | (194) |
| **Ending Book Cash Balance** | $ 7,017 | $ 7,455 | $ 7,008 | $ 7,069 | $ 6,486 | $ 6,807 | $ 6,807 |
| **Cash Collateral Usage** | | | | | | | |
| Landowner | - | - | - | - | - | - | - |
| Not-For-Profit | 16 | 438 | (447) | 61 | (583) | 321 | (194) |
| **Total** | 16 | 438 | (447) | 61 | (583) | 321 | (194) |
| **Cumulative Cash Collateral Usage** | | | | | | | |
| Landowner | - | - | - | - | - | - | - |
| Not-For-Profit | 16 | 454 | 7 | 68 | (514) | (194) | (194) |
| **Total** | 16 | 454 | 7 | 68 | (514) | (194) | (194) |
| **Post Petition Entrance Deposit Escrow** | | | | | | | |
| Beginning Balance | - | - | - | 280 | 280 | 280 | - |
| Post Petition Entrance Deposits | - | - | 280 | - | - | - | 280 |
| **Ending Balance** | $ - | $ - | $ 280 | $ 280 | $ 280 | $ 280 | $ 280 |



EXHIBIT A

Epiqbid.

6/17/2010 5:17 PM

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 10-34178** |
| | § | |
| **SEDGEBROOK, INC.** | § | **CHAPTER 11** |
| | § | |
| | § | |
| **Debtor.** | § | |

## INTERIM ORDER (I) AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO SECURED CREDITORS, AND (III) SCHEDULING A FINAL HEARING

Upon consideration of Sedgebrook, Inc.'s ("Debtor's") Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Secured Creditors, and (III) Scheduling a Final Hearing,[1] dated June 18, 2010, (the "Motion"), and all as more fully set forth in the Motion; and the Court having jurisdiction over this matter pursuant to

---

[1] All capitalized terms not otherwise defined herein, shall have the meanings given to them in the Motion.

28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409, and due and proper notice of the Motion having been provided to the necessary parties; and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and the appearances of all interested parties having been noted in the record of the Hearing; and upon the record of the Hearing and all of the proceedings had before the Court; and no objections having been received; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtor, its creditors, and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, the Court finds as follows:

     A.     On June 15, 2010 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

     B.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

     C.     The Court has jurisdiction over the matters raised in the Motion, and over the persons and property affected by the Motion, pursuant to 28 U.S.C. §§ 157 and 1334. The matters raised in the Motion are core proceedings pursuant to 28 U.S.C. § 157(b). Venue for the Debtor's case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2

D.    The Debtor provided notice of this Motion to (a) the Office of the United States Trustee for the Northern District of Texas; (b) the Debtor's 20 largest unsecured creditors; (c) Sovereign Bank, (d) the Bond Trustee, (e) NSC; and (f) ERC.

E.    As of the Petition Date, the Debtor had approximately $135.9 million in outstanding amounts due to the Secured Creditors.

F.    The Secured Creditors assert a lien on all of the assets of the Debtor..

G.    In the ordinary course of business, the Debtor requires cash on hand and cash flow from its operations to fund its working capital needs, liquidity needs, payroll obligations, and other routine payables. All of the Debtor's cash and cash proceeds are subject to the asserted security interest in favor of the Secured Creditors and, as such, constitute "cash collateral" of the Secured Creditors (as such term is defined in Bankruptcy Code section 363(a), "Cash Collateral").

H.    The Debtor has an immediate and urgent need to use its Cash Collateral. Absent the use of Cash Collateral, the Debtor will not be able to meet its working capital and liquidity needs and payroll obligations, and its estate, its creditors, and the residents at the communities will suffer immediate and irreparable harm.

I.    Good and sufficient cause has been shown to justify the grant of interim relief requested in the Motion, and the requirements of Rules 4001(c)(2) and 6003(b) of the Federal Rules of Bankruptcy Procedure have been satisfied for the entry of this order (the "Interim Order").

J.    The terms of the Debtor's use of Cash Collateral, as more fully set forth in this Interim Order, are (i) fair and reasonable, (ii) reflect the Debtor's prudent business judgment consistent with its fiduciary duties, (iii) constitute reasonably equivalent value and fair

consideration; and (iv) are essential and appropriate for the continued operation and management of the Debtor's businesses and the preservation of its assets and properties. Entry of this Interim Order is in the best interests of the Debtor and its estate and creditors.

K.     The adequate protection provided for under this Interim Order is sufficient to protect the Secured Creditors against any diminution in the value of their interest in the Cash Collateral, and is fair, reasonable and sufficient to satisfy the requirements of the Bankruptcy Code.

L.     At a final hearing on the Motion (the "Final Hearing"), the Debtor will seek approval of the relief requested in the Motion on a final basis. Notice of the Final Hearing will be provided in accordance with the requirements set forth in this Interim Order.

NOW, THEREFORE, it is hereby:

**ORDERED** that the Motion is GRANTED; and it is further

**ORDERED** that any objections to the Motion that have not been withdrawn, waived or settled are hereby OVERRULED; and it is further

**ORDERED** that to the extent any of the findings of fact set forth in this Interim Order constitute conclusions of law, and/or to the extent any of the conclusions of law set forth in this Interim Order constitute findings of fact, they are hereby adopted as such; and it is further

**ORDERED** that the Debtor is authorized to use its Cash Collateral, upon the terms and conditions set forth in this Interim Order and in accordance with the budget attached hereto as Exhibit A (the "Budget"); and it is further

**ORDERED** that the Secured Creditors are entitled to adequate protection of their interest in the Cash Collateral and other security granted to the Secured Creditors. The Debtor shall

provide the Secured Creditors with the following adequate protection (collectively, the "Adequate Protection"):

(a)     pursuant to Bankruptcy Code section 361, to the extent of diminution in the value of the Secured Creditors' interest in Cash Collateral, the Debtor shall provide the Secured Creditors additional and replacement security interests and liens (the "Adequate Protection Liens") in and upon all prepetition and postpetition assets and properties (tangible, intangible, real, personal and mixed), whether now existing or newly acquired or arising, and wherever located, including, without limitation, all receivables, other than avoidance actions arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), all Cash Collateral, and all cash and non-cash proceeds, substitutions, accessions and profits of all of the foregoing; and

(b) Subject to the Carve-Out for certain professional fees and administrative expenses, the Secured Creditors will receive a superpriority claim as provided in Bankruptcy Code section 507(b) (the "Superpriority Claim") to the extent of any diminution in the value of the Secured Creditors ' interest in the Cash Collateral, provided, however that such Superpriority Claim may not be satisfied with the proceeds of Avoidance Actions; and it is further

**ORDERED** that the Debtor shall provide to the Secured Creditors within five (5) business days following the end of each prior month, a monthly report containing the following information: (a) all receipts and disbursements of the Debtor; and (b) a reconciliation of actual receipts and disbursements with those set forth in the Budget on a line-by-line basis showing any variance to the proposed corresponding line item of the Budget; and it is further

**ORDERED** that to the extent unencumbered funds are not available to pay administrative expenses in full, the Adequate Protection granted hereunder to the Secured Creditors shall be subject only to payment of the Carve-Out. As used in this Interim Order, the

term "Carve-Out" means the following: (a) the unpaid fees of the Clerk of the Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a); and (b) the aggregate accrued and unpaid fees and expenses payable under Bankruptcy Code sections 330 and 331 to professionals retained pursuant to an order of the Court by the Debtors and any statutory committee which may be appointed in these cases; and it is further

**ORDERED** that subject to the Carve-Out, any claim or lien granted by this Interim Order with respect to the Adequate Protection shall not be subject or junior to any lien that is avoided and preserved for the benefit of the Debtor's estate, whether under Bankruptcy Code section 551 or otherwise; and it is further

**ORDERED** that this Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of any claim or lien granted by this Interim Order with respect to the Adequate Protection without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect in accordance with applicable non-bankruptcy law any claim or lien granted by this Interim Order with respect to the Adequate Protection, or to entitle the Secured Creditors to the priorities granted herein. Notwithstanding the foregoing, the Secured Creditors are authorized to file, as they deem necessary in their sole discretion, such financing statements, notices of lien and other similar documents to perfect in accordance with applicable non-bankruptcy law any lien granted by this Interim Order with respect to the Adequate Protection, and all such financing statements, notices of lien and other similar documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required to create or perfect any lien granted by this Interim Order with respect to the Adequate Protection. The Debtor is authorized and directed to execute and

724091

6

deliver to the Secured Creditors all financing statements, notices of lien and other documents as the Secured Creditors may reasonably request. The Secured Creditors, in their sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or other documents; and it is further

**ORDERED** that the automatic stay imposed by Bankruptcy Code section 362(a) is modified as necessary to effectuate all of the terms and provisions of this Interim Order, including but not limited to: (a) permit the Debtor to grant any claim or lien granted by this Interim Order with respect to the Adequate Protection; (b) permit the Debtor to perform such acts as the Secured Creditors may request to assure the perfection and priority of the liens granted herein; (c) permit the Debtor to incur all liabilities and obligations to the Secured Creditors under the terms of this Interim Order; and (d) authorize the Debtor to pay, and the Secured Creditors to retain and apply, any payments provided for under the terms of this Interim Order; and it is further

**ORDERED** that this Interim Order and the Budget shall constitute valid and binding rights and obligations of the Debtor, enforceable by and against the Debtor, in accordance with their respective terms. No obligation, payment, transfer or grant of security under this Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim, and it is further

**ORDERED** that immediately upon entry by the Court, the provisions of this Interim Order shall become binding upon and inure to the benefit of the Debtor, the Secured Creditors, all other creditors of the Debtor , any committee appointed in these cases and all other parties in interest in these cases and their respective successors and assigns (including any estate

representative, chapter 7 trustee or other trustee or fiduciary hereafter appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor ); and it is further

**ORDERED** that the provisions of this Interim Order, including the grant of claims and liens to or for the benefit of the Secured Creditors, and any actions taken pursuant to this Interim Order, shall survive the entry of any order: (a) confirming a chapter 11 plan in the Debtor's case; or (b) converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code; and it is further

**ORDERED** that in accordance with Bankruptcy Code section 364(e), which is applicable to the use of Cash Collateral contemplated by this Interim Order, in the event that any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, no such modification, amendment or vacation shall affect the validity, enforceability or priority of any Adequate Protection incurred or any claim or lien granted to the Secured Creditors under this Interim Order. Notwithstanding any modification, amendment or vacation, any Adequate Protection incurred, and any claim or lien granted to the Secured Creditors, under this Interim Order arising prior to the effective date of such modification, amendment or vacation shall be governed in all respects by the original provisions of this Interim Order, and the Secured Creditors shall be entitled to all of the rights, remedies, privileges and benefits granted herein; and it is further

**ORDERED** that except as expressly provided for herein, this Interim Order shall not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary; and it is further

**ORDERED** that to the extent not already provided for in this Interim Order, the Debtor and its respective officers, employees and agents are hereby authorized and empowered to take such actions as are necessary or appropriate to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion; and it is further

**ORDERED** that the terms and conditions of this Interim Order shall be immediately effective and enforceable upon entry of this Interim Order; and it is further

**ORDERED** that The Final Hearing is scheduled for _____, **2010 at ___ __.m. (prevailing Central Time)**. Within 3 business days following the date of entry of this Interim Order, the Debtor shall serve copies of the Motion, this Interim Order and a notice of the Final Hearing (the "Final Hearing Notice"), by first-class mail, postage prepaid, on the following: (a) the Debtor's largest unsecured creditors; (b) the Bond Trustee; (c) Sovereign Bank; (d) the Office of the United States Trustee; and (e) all parties in interest and counsel having filed written requests for notice in these cases. The Final Hearing Notice shall state the date, time and location of the Final Hearing. The Final Hearing Notice shall further state that any party in interest objecting to the relief requested in the Motion on a final basis shall file a written objection with the Court by no later than _____, **2010 at 4:00 p.m. (Central Time),** and shall serve such objection so it is received on or before such date and time by the following:

> Martin T. Fletcher
> mfletcher@wtplaw.com
> Stephen F. Fruin
> sfruin@wtplaw.com
> Whiteford Taylor and Preston, L.L.P.
> Seven Saint Paul Street
> Baltimore, MD 21202
> (410) 347-8700 Telephone
> (410) 752-7092 Facsimile

724091                                                                 9

Thomas R. Califano
thomas.califano@dlapiper.com
Jeremy R. Johnson
jeremy.johnson@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 835-6000
Fax: (212) 835-6001

Office of the United States Trustee
for the Northern District of Texas
1100 Commerce St
Dallas, TX 75242-0996
(214) 767-8967

**ORDERED** that the Court shall retain jurisdiction over all matters arising from or

relating to the implementation of this Interim Order.

### **### End of Order ###**

**Exhibit A**

**BUDGET**

*1906343/v2*